532 So.2d 776 (1988)
Angela Gonzales, Wife of/and Winston A. ST. HILL
v.
Carolyn Kass TABOR a/k/a Carolyn Falgout and State Farm Fire and Casualty Company.
No. 87-CA-526.
Court of Appeal of Louisiana, Fifth Circuit.
July 26, 1988.
Rehearing Denied November 17, 1988.
Writ Granted January 20, 1989.
Edward R. Drury, Morris W. Reed, New Orleans, for plaintiffs-appellants.
Daryl A. Higgins, Gretna, for defendants-appellees.
Before KLIEBERT, BOWES and GAUDIN, JJ.
GAUDIN, Judge.
This suit was filed in the 24th Judicial District Court by Mr. and Mrs. Winston A. St. Hill, whose 16-year-old son Shawn *777 drowned in a residential swimming pool during a high school graduation party.
A 12-person jury found the pool-owner, Mrs. Carolyn Falgout, not negligent. We affirm.
Prior to trial, a settlement agreement between Shawn's parents and Mrs. Falgout's insurance carrier, State Farm Fire and Casualty Company, was reached, and State Farm was dismissed as a party defendant.
Following the jury verdict, the plaintiffs moved for a judgment notwithstanding the verdict, alleging that the trial judge erred (1) in not removing juror Harvey Rodriguez, (2) in limiting each side to six peremptory challenges, (3) in verbally communicating with the jury outside of the presence of the parties and their counsel and (4) in failing to declare a mistrial once it became known that the alternate juror, Selma Taylor, participated in jury discussions after having been excused.
This motion was denied by the trial judge, who did not give any reasons.
In their initial brief to this Court, petitioners-appellants again assigned errors relating to jury selection and jury activity. Appellee's brief attempted to deal with these issues.
In a reply brief, filed over appellee's objection, appellants again dwell on the alleged jury problems and they also, for the first time, argue that the jury verdict was contrary to the evidence and was not supported by a reasonable factual basis.
We shall initially consider the jury verdict and whether it was clearly wrong, then discuss appellant's assignments of error concerning jury selection and jury activity.
The backyard party in question was held on May 11, 1985 at Mrs. Falgout's home, 647 Ave. D in Westwego, Louisiana. Guests had been invited to an "Anything Goes Pool Party" beginning at 7 p.m. in honor of Mrs. Falgout's son, Steven Tabor, aged 18, Mrs. Falgout's son by a prior marriage and a member of John Ehret High School's graduating class. Actually Steve was a GED student and attended adult education classes.
Approximately 150 persons attended the party, including Shawn and some others under 18 years of age. Alcoholic beverages were available, including several kegs of beer and a fruit punch spiked with two bottles of rum. The punch was described as "weak" and hardly anyone drank it. Food, including 500 hot dogs, and soft drinks were also provided. One guest, Brian Pertuit, brought two watermelons to the party and someone spiked them. Most of the beverages and food were under a covered patio and guests would help themselves to whatever they wanted.
Mrs. Falgout testified that she assumed those under age would not drink the alcoholic beverages. She said:
"... I figured they were old enough to know and obey their parents.
"I watched for them and also the policeman. I wouldn't let anyone get intoxicated or make a scene ..."
Steve said that his mother cautioned him about serving alcohol to minors. He said:
"She told me that she didn't want, you know, any minors coming and drinking and I said, `Mom, it is supposed to be a graduation party. Most people are going to be 18 or over,' and she said, `Well, to make sure everything is okay, I will hire a policeman.'"
The affair was, according to witnesses, a normal high school graduation party. Music was played and there was a certain amount of so-called horseplay. Most of the guests who went into the pool had swimming attire while about four or five others were pushed in fully clothed. The horseplay was described as "playful[1]," not violent or unfriendly.
To prevent trouble Mrs. Falgout hired a uniformed police officer, Sgt. Anthony Wajda. He said the poolside horseplay was "normal." Other than for those instances where guests were pushed into the pool clothed, the overall behavior of the guests, according to the officer, was "extremely *778 great." He added: "The conduct of the participants was fantastic."
Sgt. Wajda was hired to keep order, not as a lifeguard. Steve, who doesn't drink, said:
"... I didn't feel we needed one (a lifeguard) because I am a certified lifeguard, and my sister and a couple of other friends are."
Shawn, who could not swim, nonetheless brought his swimming suit and entered the pool. He told a friend, Mark McGowan, that he would stay in the shallow end to avoid being tossed in where it was deep. The pool was 32 feet long, 22 feet wide and 10 feet deep at one end. The shallow end was three feet in depth.
Extra lighting was placed around the pool area while the pool itself had submerged lighting. The pool had clearly visible numerical markings showing the depth at various spots. Extra chlorine had been put in the pool before the party to keep the water as clear as possible.
During the evening, as many as 30 persons were in the pool at one time. This usage, along with the fact that some guests were shoved in fully clothed, caused the water to cloud as the evening progressed.
At close to 11 p.m. when the party was ending, only Steve and several other boys were in the pool, diving from the diving board. After a dive, Steve said that "he felt an arm" in the water. It was Shawn's arm.
Steve testified as follows:
"I dove off my diving board and I did a flip, and I went down in the water feet first and when I got to the bottom, I felt an arm and I grabbed it and I shook it, and when I opened my eyes, I saw him so I tried getting him out and I was holding onto his wrist, but I couldn't get up out of the water because it was ten and a half feet deep so I didn't want to let go of him so I stuck my head out and hollered for help. At first, they thought I was kidding because they couldn't see him. It was far down. I hollered" "Help" once and they laughed and I said a curse word to let them know I was serious. When they realized I was serious, I went underneath him and tried pushing him to the side surface and then several people jumped in and helped and pulled him out and started giving him CPR immediately."
Keith Bouvier, one of several volunteer firemen who were there as guests, administered CPR until an ambulance arrived, according to Bouvier, "within a couple of minutes." The ambulance, from nearby West Jefferson General Hospital, was called at 11:03 p.m. and it reached the Falgout residence at 11:09 p.m. At 11:14 p.m., the ambulance was at the hospital. Bouvier and an ambulance attendant continued administering CPR while the ambulance drove to the hospital's emergency room, which had been put on alert by the ambulance driver. All of this was to no avail.
Following the drowning, Sgt. Wajda conducted an investigation for the Westwego Police Department. He interviewed a number of persons who were there but nobody could say how, where or why Shawn entered the pool shortly before he was found underwater. None of the witnesses who testified at the trial knew how, where or why Shawn got into the water.
In their petition, plaintiffs alleged in paragraph IX that Shawn "... was unwillingly shoved in the water and was caused to drown by reason of negligence of the defendant (Mrs. Falgout) and then its agents and the servants in failing to properly supervise the decedent and to rescue him from drowning."
The testimony, however, did not reveal that Shawn was "unwillingly shoved in the water." Not a single witness testified to that.
There is, of course, the possibility that Shawn was pushed into the water at the deep end of the pool. On the other hand, as appellee suggests, Shawn might have ventured out too far from the shallow end and slipped. This is all conjecture.
As the plaintiff's were not able to ascertain how Shawn drowned, they were obviously unable, as far as the jury was concerned, *779 to establish a causal connection between Shawn's death and any breach of duty allegedly owed by Mrs. Falgout, such as her failure to hire a lifeguard, her failure to control horseplay around the pool or her failure to cease swimming activity once the water became cloudy.
There is no statutory or jurisprudential requirement that a lifeguard be hired for a backyard pool party, particularly if several guests are certified lifeguards; and while some guests were shoved into the water, the testimony showed that the horseplay was in fun and that it was never out of control.
Mrs. Falgout said that the water became cloudy about 9 or 9:30 p.m. because swimmers were unintentionally carrying grass, sand and dirt into the pool with them. She did not modify swimming activities, she stated, because "... they were all good swimmers in the pool. I thought everybody in the pool knew how to swim. I saw no danger in it."
The autopsy revealed that Shawn's blood alcohol level was .055, below the legal intoxication level of .10. Shawn, according to the testimony of his friends, had several drinks at the party but there was no testimony that this caused or contributed to the drowning.
Plaintiffs called William Lloyd, Tulane University's swimming team coach, in an attempt to cast negligence on Mrs. Falgout. He was qualified as an expert in water safety and pool maintenance although most of his experience in and around pools has been in the State of Virginia. This was his first time testifying in court, here or there.
Mr. Lloyd testified about the problems associated with having a party around a backyard pool; and, in his opinion, Mrs. Falgout should have hired a lifeguard. He said:
"... when you introduce ... alcohol you invite a lot of other horseplay and under that situation you need to have someone constantly in supervision of a pool activity. To be honest with you I would not allow it."
Mr. Lloyd also said that the pool water was too cloudy and that there should have been a floating rope divider between the deep and shallow portions of the pool, but he did not know how, where and why Shawn drowned so he could not and did not say that there was a causal connection between any alleged pool and/or party failing and Shawn's death.
Dr. Paul McGarry, who performed the autopsy and who testified as an expert witness, said that Shawn was submerged a "very few minutes ... only a few minutes."
Dr. McGarry stated that when Shawn "... arrived at the hospital he was without any vital signs, he did not breathe and he did not have a pulse or heartbeat but his heart did respond to electrical shock and it did start working again, start pumping again. This indicates that the heart muscle was not long inactive ... A matter of a few minutes is all that I suspect ... before he was brought out of the water."
The response to the electrical shocks was described by Dr. McGarry as "... feeble and ineffective and did not bring him back."
Dr. McGarry was questioned at length, under direct and cross, as to exactly how long Shawn was under water. He explained the variables, such as how much oxygen is in a person's lungs when they go beneath the surface. Dr. McGarry gave this description of the drowning process:
"The first minute he has oxygen, he's stopped breathing he's under water and he can't breathe so he's using up whatever oxygen is in his lungs, whatever is in his blood at that time. The second minute he's beginning to feel a very definite need for more oxygen, this indicates that his organs are becoming oxygen deprived and giving him the reflex stimulation to breathe. He's unable to breathe so he makes breathing movements in a water atmosphere and within the next five to eight minutes after that his brain has been without oxygen for too long and the brain cells are lethally damaged."
*780 Shawn, according to Dr. McGarry, could have been under water for two or three minutes or up to seven or eight minutes.
Mrs. Falgout's son was not named a party defendant and her insurer, State Farm, settled. The most significant issue before the jury when this case was tried was Mrs. Falgout's possible negligence and personal liability.
In anticipation of the poolside party, Mrs. Falgout had extra lighting installed, she hired a policeman to keep order and she did everything else she thought necessary and reasonable. The jury found her not responsible for the tragic and unforeseen drowning of a guest who could not swim yet went into the pool regardless.
In the total absence in the record of any causal connection between any alleged breach of duty and Shawn's drowning, we cannot say the jury erred. In Preston v. Granger, 517 So.2d 1125 (La.App. 5th Cir. 1987), this Court said at page 1130:
"In cases in which the evidence is in disagreement, the trier of fact is obliged to make credibility decisions based on its reasonable evaluations of witnesses and on its reasonable inferences of fact from the evidence presented. Unless manifestly erroneous this decision should not be disturbed by this court in its appellate review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979)."
We turn now to the assignments of error regarding the jury. In their original brief, appellants made these arguments:
I. THE DISTRICT COURT ERRED IN FAILING TO DECLARE A MISTRIAL ONCE IT WAS REVEALED THAT THE ALTERNATE JUROR PARTICIPATED IN THE JURY DELIBERATIVE PROCESS.
II. THE DISTRICT COURT ERRED IN VERBALLY COMMUNICATING WITH THE JURY OFF THE RECORD AND OUT OF THE PRESENCE OF PLAINTIFF COUNSEL DURING DELIBERATIONS.
III. THE DISTRICT COURT ERRED IN REFUSING POST-TRIAL INTERVIEW OF JURY AFTER ALTERNATE JUROR INVADED DELIBERATIVE PROCESS.
IV. THE DISTRICT COURT ERRED IN NOT EXCUSING A JUROR FOR CAUSE WHEN ONCE SEATED AND SWORN JUROR ADMITTED HE WAS NOT FORTHRIGHT DURING VOIR DIRE.
The alternate juror was Selma Taylor. When the trial ended, the district court judge gave Mr. Taylor a certificate acknowledging his jury service and thanked him for his participation. Mr. Taylor did not leave however; instead he inadvertently went to the jury room and listened to the deliberations for approximately 45 minutes before a court bailiff noticed his presence.
The trial judge immediately went to the jury room where was advised that Mr. Taylor had not participated in the discussion. The trial judge called the foreman to the courtroom and questioned him in open court about Mr. Taylor. The foreman confirmed the fact that Mr. Taylor had just sat in the deliberation room and listened.
Louisiana's Code of Civil Procedure does not give a trial judge specific instructions in every instance but LSA-C.C. art. 21 states:
"In all civil matters, where there is no expressed law, the Judge is bound to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent."
Appellants contend in their brief that Mr. Taylor was an extraneous influence on the jury. No cases are cited.
It does not seem, however, that Mr. Taylor's mere presence had any effect on the jury. The trial judge correctly decided that this slight irregularity did not interfere with either orderly jury deliberations or the subsequent verdict.
The second assigned jury error is connected to the first. Neither appellants nor their attorney was present when the trial judge called Mr. Taylor to the courtroom, where he was questioned and again *781 released. If a trial judge communicates with a jury or with an individual juror, he should do so in the presence of the parties or at least their counsel. However, appellants do not say how or why they were prejudiced.
The third assignment of jury error is also related to the first. Appellants say they were deprived of the opportunity to question Mr. Taylor or the jury foreman.
Mistrials are properly declared when, because of some circumstance, justice cannot be achieved. Such was not the case here. When the trial judge learned that Mr. Taylor neither spoke nor contributed in any other fashion to the jury discussions, he (the trial judge) rightly and appropriately denied the request for a mistrial.
In the fourth assignment of jury error, appellants contend that juror Harvey Rodriguez should have been removed for cause on the second day of trial after a witness named Don Gibson had been on the stand. Mr. Gibson was a party guest and he had been called by petitioners to testify.
During a break in the proceedings, Mr. Rodriguez told the trial judge that while he did not recognize Mr. Gibson by name, he did now recognize him as a person he had gone to school with. Rodriguez further said that other witnesses may fit into the same category. The trial judge then advised counsel that Mr. Rodriguez had "... approached the bench and suggested to the court that he had gone to school or knew several of the witnesses who were involved in this matter ... I simply asked him if he felt that it would affect his ability to render a fair impartial verdict in this matter and he said it did not."
Appellant's attorney moved to strike Mr. Rodriguez for cause, saying Mr. Rodriguez had not been truthful during voir dire. Mr. Rodriguez, however, apparently had been truthful on voir dire when he said he didn't recognize any names, just as he was truthful when he later approached the trial judge saying he recognized Mr. Gibson's face. The trial judge no doubt felt Mr. Rodriguez was also telling the truth when he (Rodriguez) said he could render a just verdict.
Trial judges are vested with broad discretionary powers when determining the capability of jurors to serve. Only when an abuse of this power occurs should an appellate court intervene. See Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir. 1975), writs denied at 321 So.2d 363 (La. 1975), and many other cases with similar holdings.
Here, the trial judge assisted in the selection of a representative jury. He did not err either in his handling of the alternate juror or in his refusal to dismiss Mr. Rodriguez once the trial was under way.
We affirm the judgment in Mrs. Falgout's favor with appellants to bear costs.
AFFIRMED.
BOWES, Judge, dissenting.
I disagree with the conclusion reached by my learned brothers of the majority that the defendant, Mrs. Falgout, either did not breach any duty owed by her to Shawn St. Hill, the decedent, or that any such breach was not a cause in fact of his death.
To begin with, the recitation of facts in the majority opinion leaves much to be desired, in my view, and would lead one to believe that the defendant sponsored a harmless graduation pool party at which there was a little playful horseplay, but that the overall behavior of the guests was "extremely great" and "the conduct of the participants was fantastic." These last two statements are attributed to no less a witness than a policeman, Sgt. Wajda, who was hired by Mrs. Falgout to supposedly keep order. Overall, I found the factual part of the opinion of my revered colleagues to be over-ample in generalities and sparse in the specifics that, taken all together, show the negligence, omissions, and breaches of duty by the defendant toward the decedent, which contributed to his drowning.
Since I was originally designated as writer of the opinion, I have been over the facts and testimony in this case with a fine-tooth comb and reached a completely opposite *782 conclusion from that of my brethren. I am acutely aware that the verdict of the trier of fact, particularly a jury of peers, should not be reversed unless it is clearly wrong or manifestly erroneous. Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985). However, taking all the testimony and circumstances into consideration, I am convinced, beyond the shadow of a doubt, that the verdict of the jury was manifestly erroneous or clearly wrong, and, in the interest of justice, must be reversed. In a capsule, I considered these to be the correct facts of the case:
1. That it was known by the defendant, in advance, that there would be well over 100 minors and teenagers attending the party.
2. That unlimited alcohol was served to these youngsters with the knowledge and consent of the defendant hostess under "whoop it up" graduation party circumstances.
3. That there was modern, amplified, music blaring by the pool, to add to the emotional frenzy and make talking and communicating difficult at best.
4. That numerous persons (more than the four or five maintained by the majority) were thrown into the pool, many of them fully clothed.
5. That the hired policeman, Sgt. Wajda, spent nearly all of his time regulating the parking of cars in the front and had practically nothing to do with keeping order around the pool or even attempting to do so. He certainly made no attempt to stop the pushing of fully clothed people into the pool. (Perhaps he thought this conduct was "extremely great" and "fantastic.")
6. That no lifeguard, or anyone else, was hired to supervise swimming activity, although, as the majority admits, there were at least as many as 30 people in the pool at one time.
7. That there was at least one watermelon fight in the pool, which worsened the condition of the water.
8. That the frenzied activity of these youngsters was permitted to go on for some four hours, with no organized supervision or deterrent or discipline of any kind, while alcohol was being freely consumed by the kids. As the majority says "guests would help themselves to whatever they wanted."
9. That unsupervised swimming with no restrictions, even against diving (there was a diving contest!) was permitted even after the water became so murky and cloudy that it was actually opaque.
After considering all these factors, I concluded that this was a wild and completely unsupervised and undisciplined party, fraught with danger for the youngsters who participated. It is a miracle that only one child drowned or was hurt. Consequently, I considered the conduct of the defendant in permitting and actually sponsoring this party under these circumstances to be a totally irresponsible act and violative of her legal obligations and duties to the decedent who drowned, partially as a result thereof.
In detail, I find that the testimony and evidence in the record reveal the following:
Shawn St. Hill, 16, was a guest at a high school graduation swimming party given by Mrs. Falgout for her son Steven Tabor, 18, the night of May 11, 1985. Throughout the evening, there were some 150 guests, according to Mrs. Falgout, ranging in age from 16 to adults, with the great majority being of high school age.
At the party, alcoholic beverages were served, including beer, "spiked" watermelon and "jungle juice", a mixture of fruit punch and rum. I disagree with the majority that there is sufficient evidence to conclude that the jungle juice "was weak and hardly anyone drank any of it"but, if it was, there was plenty of beer to make up for it. Mrs. Falgout testified that there was no limit and no questions asked about the amount of alcohol consumed by anyone or the ages of the guests. Neither was there any direct supervision of, nor limitations placed upon, the activities of the participants. Late in the party, there was a period of time during which wild and rough horseplay took place. This consisted of certain members of the Ehret football team, and others, throwing many other *783 guests, either fully dressed or in swimwear, into the pool. Apparently, no witness knew just how many.
Toward the end of the evening, there was a diving competition. When Steven Falgout dove into the pool, he felt Shawn's body at the bottom, although it could not be seen because of the extreme cloudiness of the water. With help, he pulled Shawn from the water. Resuscitation efforts were begun and Shawn was taken to West Jefferson Hospital, where he subsequently expired, and where the official cause of death was determined to be by drowning.
The testimony revealed that Mrs. Falgout obviously was expecting a very large crowd of high school students. She had prepared 500 hot dogs and other food and hired a police officer who acted as a private duty security officer at the party. However, the evidence also showed that Sergeant Wajda's principal duties were to prevent fights and property damage and to keep the driveways clear. The officer stayed mainly in front of the house and, while he occasionally patrolled the backyard pool area, he did not attempt to regulate or control the activities of the guests, including the wild horseplay, or supervise swimming activities.
While there was testimony to the effect that there were some persons at the party who were qualified lifeguards, all were guests (except for Steven, the host) and all guests were partaking in the social activities, including, apparently, the imbibing of alcoholic beverages. Steven claimed he did not drink. Nevertheless, there was no designated lifeguard, or anyone else, to watch or control pool activity. Mrs. Falgout did not attempt to police the students as to their activities or their drinking beer or jungle juice, assuming that "they were old enough to know and obey their parents." She also said "I didn't ask ages."
The pool was large22 ft. by 32 ft., with a depth of 3 to 10 feet. The majority concedes that the water became cloudy sometime approximately midway through the party "about 9:00 or 9:30 p.m. because swimmers were unintentionally carrying grass, sand and dirt into the pool with them." Additionally, according to expert testimony, the great number of swimmers (including many who were thrown in fully clothed) also contributed strongly to this condition. In addition, at least one watermelon fight took place with a watermelon being "busted" over Steve Tabor's head in the pool. The murkiness became continually worse, until the water became impenetrableone actually could not see through it. But the swimming activities were not modified or stopped because, as the majority opinion states, Mrs. Falgout thought everyone in the pool were good swimmers: "I thought everybody in the pool knew how to swimI saw no danger in it." No control whatsoever was exercised by Mrs. Falgout and perhaps none had been anticipated because the invitation read "Anything goespool party; 7 p.m. till _____."
The pool itself was lighted from within, and there were also exterior lights. However, these were not sufficient to overcome the murkiness of the water. There was a "disc jockey" poolside playing very loud music throughout the party.
Shawn had gone to the party with his swim suit, apparently prepared to get into the water, even though he could not swim at all, or very little. The evidence does not make this clear to my satisfaction. He drank at least some beer at the party. His blood alcohol level was measured at the hospital that night and found to be .055 (intoxication is generally accepted to be a level of .10 or more). Shawn had observed the horseplay amongst the football players become rough and rowdy and the majority says he told a friend, Mark McGowan, that "he would stay in the shallow end to avoid being tossed in where it was deep." If this is correct, then, to me, this is "proof of the pudding" of how dangerous and violent the party became.
Late in the party, the football players and others, including Mrs. Falgout's adult brother and Steven, had begun throwing people into the deep end of the pool. At least one witness, Don Gibson, left the party because the activity became "serious" and "violent", although Mrs. Falgout and some of her guests thought it *784 had all been done "in fun." Mrs. Falgout was well aware of this activity, as were the other adults present, but considered that the guests were "daring each other in a playful manner." No one took any steps to interfere with or stop the boys from throwing others into this now cloudy and impenetrable pool water. Several witnesses who testified that they were participating in throwing others into the pool also admitted to having consumed intoxicants at the party and, of these participants, many were minors and in their teens at the time of the incident.

LIABILITY
There is a dearth of jurisprudence on the subject involved in the instant case. However, in Walker v. Union Oil Mill, Inc., 369 So.2d 1043 (La.1979), our Supreme Court clearly enunciated the duties and responsibilities of a property owner to others in the management of his property:
In determining an owner's liability under Civil Code Articles 2315 and 2316 the test has been stated to be whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976). The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. The duty would be greater to a person of young age and immature judgment. It would be lesser to a person with experience, knowledge and familiarity with the premises. [Emphasis supplied].
See also Dunne v. Orleans Parish School Bd., 444 So.2d 1317 (La.App. 4 Cir.1984) (school board failed to act reasonably in management of its gymnasium premises).
More importantly, I agree with the astute analysis of the jurisprudence, regarding the duty of adults after they have furnished alcohol to minors, by the Second Circuit, in Garcia On Behalf Of Garcia v. Jennings, 427 So.2d 1329 (La.App. 2 Cir. 1983). That Court stated that its research revealed no Louisiana cases on this exact subject, but they undertook a scholarly discussion of analogous cases. In Garcia, the court dealt with a case in which an adult companion purchased and gave alcohol to a minor, then later took the minor to a point near a bayou and permitted him to get out of the car at a steep incline. He subsequently fell into the water and drowned. In reversing a lower court decision sustaining an exception of no cause of action (which had had the effect of holding that there was no duty to the minor), the Court said:
Turning to the instant case, we note that LSA-R.S. 14.91.3 makes it unlawful for any adult to purchase on behalf of a person under the age of 18 any alcoholic beverage either of high or low alcoholic content. The obvious intent and purpose of this statute is substantially the same as the statutes prohibiting the sale of alcoholic beverages to minors involved in the Chausse case. The risk of injury to an intoxicated minor of the nature involved in this case, falling into a bayou and drowning, depending on all the attendant facts and circumstances, may well be encompassed within the duty prescribed by the statute. Although the statute does not directly impose civil responsibility, it serves as a guideline for the determination of an adult's civil duty to REFRAIN from procuring alcoholic beverages for use by a minor. Boyer v. Johnson, supra.

The defendants had a DUTY not to purchase liquor for the minor and furnish it to the minor. Having done so the defendants further had the DUTY to exercise some degree of control and protection for the minor's safety. *785 Analogizing from the Lee, Pence, Thrasher, and Sanders cases, the defendants certainly had a duty to refrain from affirmative acts which placed the intoxicated minor in peril, and they allegedly violated this duty by taking the minor to a point near the bayou and allowing him to get out of the car at a dangerous place. [Emphasis supplied]
In establishing a duty to the minor by the adult here, plaintiffs called as an expert witness, Mr. Bill Lloyd, who was qualified by the court as a water safety expert. Mr. Lloyd testified as to the importance of maintaining clear water, and explained the process of preparing the pool for an occasion in which a large crowd is expected, in order to keep the water clear throughout the evening. He testified that throwing people in the pool fully clothed is a significant factor in clouding the water.
Mr. Lloyd stated that the pumps should be backwashed to get them as clean as possible to enable the pumps to work at maximum capacity. Chemical balances should also be checked such as the proper chlorine level. (Steven testified that the pool was cleaned and extra chlorine added the morning of the party, but the filters were not backwashed because they appeared to be clean). Mr. Lloyd further said that the number of persons going in and out of the pool, particularly those tracking in dirt, and sand, or those fully clothed, was an important factor affecting the clarity problem.
This expert also explained the dangers of horseplay in a pool area and opined that in a situation in which such activity was being conducted among individuals who had been drinking, it was essential to have a really qualified lifeguard on duty continuously. Furthermore, the lifeguard would not be able to perform his duties if he had been drinking. According to Mr. Lloyd:
... in my opinion, if you have the alcohol near water, you have a very dangerous combination. In addition to the accidents that can happen with just a person drinking themselves and just moderately getting in to take a casual swim and the possibility of them having an accident or lose control in the water, when you introduce the alcohol you invite a lot of other horseplay and under that situation you need to have someone constantly in supervision of pool activity.
When asked if a lifeguard could be a party participant, the water safety expert stated:
When a lifeguard takes alcohol they're no longer a lifeguard. Youlifeguarding is a job and you have to be in complete control of your own abilities if you're going to help someone else. There is no way that a person could consume alcohol and have their total lifeguarding ability with them. You would want to have somebody as a designated lifeguard and just sit them down and pay them whatever to do the job.
In response to the question as to why horseplay in such a situation is dangerous, Mr. Lloyd responded:
There are numerous reasons that in a backyard situation where often the depth of the pool changes very rapidly, if you're screwing around on the deck area around and jumping into the pool, its very easy to lose track of where you are on the side of the pool and perhaps fall into a three and a half foot area that you thought was ten feet or vice versa going into a ten foot area that you thought was three feet, or anywhere in the middle. But also people outside the pool, people in the pool, the possibility of one landing on top of another exists, especially in a situation where its not the biggest pool and you've got people that are obviously going to be doing numerous different activities in a very small area.
Although the majority makes a weak attempt to lessen his expert status, the defendants presented no expert of their own of any kind and the expert testimony of Mr. Lloyd stands uncontradicted by anyone.
Taking cognizance of the above jurisprudence, and considering the facts of the case before us and the expert testimony above, I am of the opinion that Mrs. Falgout had a duty not to purchase or provide alcoholic beverages for the teenagers attending the *786 party at her home. Having provided the alcohol, she had a grave and positive duty to exercise control of their activities and to provide protection for them. This duty is designed to protect the minor from his own foibles, negligence and fault, arising out of the consumption of alcohol. Garcia, supra.
In fact, the law imposed such a duty on her regardless of the alcohol involved. Mrs. Falgout's permission of the unbridled and dangerous horseplay among minors and teenagers to whom she had served intoxicants was a dual breach of that duty toward them. Any reasonable person should have foreseen the danger involved in the activities permitted here among such a large crowd of immature young people, who were steadily consuming intoxicants, around water deep enough and cloudy enough to drown in. At this party, an Olympic swimming champion, who developed a cramp or was injured, could have drowned just as easily as Shawn.
The totality of the circumstances here under which Shawn drowned compels me to conclude that Mrs. Falgout's overall conduct and acts of omission and commission constituted negligence and a breach of duties owed to Shawn, under the circumstances of this party, which were a cause in fact of his death.
I further conclude that Mrs. Falgout did not act in a reasonable manner in view of the probability of injury to others and find to be acts of negligence or omission on her part the nine factual circumstances listed above (as a capsule), which caused or greatly contributed to the drowning death of Shawn St. Hill.
Taken as a whole, these acts and omissions constitute a failure on the part of Mrs. Falgout to exercise reasonable care for the safety of her guests and exposed Shawn St. Hill to an unreasonable risk of harm. The general and uncontrolled melee at the party, at the very least, contributed to the failure to discover Shawn until it was too late. Had there been some control and supervision exercised over the wild activities of these teenagers, and particularly if throwing people in the pool had been prohibited, Shawn would not have been placed in a dangerous situation. Had a full-time qualified lifeguard (or other designated supervisory person) been monitoring the pool properly and the swimming activities, and had the water been clear enough to see through, Shawn's submersion should have become immediately obvious, or discovered within a very short period of time. For whatever reason Shawn's body came to be under water at the deep end of the pool, Mrs. Falgout's irresponsibility and negligence caused the conditions which prevented a timely discovery and early rescue and, therefore, her breach of duty was a cause in fact of Shawn's death.
In reviewing a jury's finding that defendants were not negligent in a fatal hunting accident, the Supreme Court, in reversing that finding, recently stated in Watson, supra:
... A finding of fact by a trial court should be upheld "unless it is clearly wrong." And "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court." Id. Proper review requires that the appeal court determine from the record that the trial court finding is not clearly wrong or manifestly erroneous. [Emphasis supplied]
Here, as in Watson, in my opinion, the jury's finding that Mrs. Falgout was not negligent is against the great weight of the evidence and jurisprudence, considering all the circumstances present, and is clearly wrong.
The majority opinion states that none of the witnesses knew how or why Shawn "got" into the water, and that the jury found Mrs. Falgout not responsible for the drowning of a guest who could not swim yet "went" into the pool anyway. Such statements reveal the majority's belief that Shawn voluntarily entered the pool (at the shallow end) just prior to his drowning. In fact, they state exactly this in the early part of the opinion. My appreciation of the evidence leads me to believe that these assumptions cannot be substantiated in the record. The fact is, because of the general *787 uproar, it was never discovered or proven how the boy came to be in the deep end of the pool in the latter part of the party just prior to his drowning. He could have been pushed into the deep end just as easily as entering voluntarily, or even slipped and fallen in, unnoticed, in the prevailing wild atmosphere of the party.
However, the majority concludes that Mrs. Falgout cannot be held liable because "there is a total absence in the record of any causal connection between any alleged breach of duty and Shawn's drowning." I disagree. In my view, in actual fact, the unruly and reckless atmosphere of the party effectively negated any chance that it will ever be determined how Shawn came to be in the water and how or why he drowned; and, as noted in detail above, the circumstances prevailing at the party (consumption of alcohol, rough horseplay, no control, no supervision of any kind, cloudy water, etc.) are the causal connections and breaches of duty involved; and these same circumstances certainly eliminated the possibility that, once Shawn became submerged, he could have even been seen, much less have been rescued timely.
Therefore, it appears to me that the effect of the majority's decision today is to allow a defendant to manufacture a defense out of the very negligence which renders her culpable in the first place. Although the pandemonium permitted at the party created the risk and the danger, the majority decision operates to shield Mrs. Falgout from the consequences of her own negligence.
I certainly do not believe that the law should require every host of a backyard pool party to hire a professional lifeguard or ban alcohol, or set up extra lights, etc., in order to fulfill a duty toward guestsas circumstances alter cases. However, the totality of the circumstances here go far beyond that lack. Taken all together, it seems clear to me that the minuscule precautions taken by Mrs. Falgout before the party began might have been sufficient at a party with far fewer people, or older and more mature participants. Here, there was simply a complete failure on the defendant's part to act as a reasonable person in controlling conduct during the party in view of the probability of injury to others under the circumstances, which she permitted to prevail for several hours.
Should this majority's decision be allowed to stand, it will effectively give "carte blanche" and a free ride to any landowner-defendant who takes some precautions, however woefully inadequate, to insulate themselves from liability; but who takes no responsibility whatever to control the circumstances created and/or permitted by him, which causes or contributes to the death or injury of another; and, unless it can be proven how one came to be drowned, the pool owner owes no liability to anyone. In other words, "Enter At Your Own Risk" becomes the new law of this circuit, and perhaps the entire State of Louisiana. Because there is such a dearth of jurisprudence in this area, I fear greatly for the grievous effects of this majority decision.
Accordingly, it is my hope that the Supreme Court of Louisiana will see fit to review this decision in order to give us some positive jurisprudence and guidelines in this area.

SHAWN'S COMPARATIVE NEGLIGENCE
In determining liability and damages, I find that Shawn was partially at fault and thus contributorially negligent. Knowing his swimming limitations, he nevertheless went to the party with swimming trunks obviously intending to enter the pool. He also engaged in mutual horseplay earlier in the party, although of a milder nature than the others. The testimony indicated that Shawn and a friend pushed each other into the water in the early part of the pool party for a short period of time until Shawn stopped this activity himself by telling his friend of his swimming limitations. I am unable to discover which one initiated the pushing.
In addition, Shawn did not leave the party or the pool area once the activity became rough and perhaps he could have just stayed away from close proximity to the *788 pool. However, I feel cognizance must be taken of the fact that at 16 years old, Shawn's judgment was immature and was clouded, or made worse, by the alcohol that was provided to him by Mrs. Falgout. Therefore, some allowances for Shawn's poor selection of alternatives must be made because of these factors.
Nevertheless, Shawn was at least aware of some of the possible dangers. Consequently, I find that Shawn's actions contributed somewhat to his accident, as he failed to act as reasonably and prudently as he might have under the circumstances.
Under La. Civil Code Art. 2323, when contributory negligence is applicable to a claim, the doctrine of comparative negligence is applied.[1] In discussing the allocation of comparative negligence, the Supreme Court, in Watson, supra, stated that the Uniform Comparative Fault Act provides as follows:
In determining the percentages of fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed.
The Court continued:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
Applying these factors to the circumstances at hand, I find that Shawn was twenty-five per cent at fault in his accident.

DAMAGES
Having determined that the jury was clearly wrong in finding that Mrs. Falgout was not negligent, and having determined that her negligence was a cause in fact of Shawn's death, under La.Code Civ.Pro.Ann. art. 2164, the Court of Appeal is empowered to render any judgment which is just, legal and proper upon the record on appeal. Therefore, I now turn to the issue of damages which I would award to the plaintiffs for the death of their 16-year old son.
The testimony revealed that Mr. and Mrs. St. Hill were living apart due solely to Mrs. St. Hill's employmentit was economically necessary that she work in Baltimore. However, the family had planned to move to Baltimore the summer Shawn died and live together as a unit again. Both Mr. and Mrs. St. Hill testified that they had a close and loving relationship with Shawn. While there was testimony that Shawn worked part time, there is nothing to suggest that he supported his family in any significant way.
As for Shawn, he was found in the pool at approximately 10:30 p.m. After being pulled from the water, C.P.R. was administered. When he arrived at the hospital, there were no vital signs, but his heart did respond to electrical shock and began beating. It is not known exactly how long he was in the water, but it was determined by the doctors that he was still alive and probably fully conscious when he went underwater; there were further medical indications that he struggled, then convulsed, before losing consciousness. The medical records indicated he suffered severe brain damage, and there is no evidence that he *789 ever regained consciousness. It is unknown, what, if any, pain he may have suffered at the hospital prior to his death.
I have reviewed relatively recent jurisprudence in order to determine the appropriate damages for Shawn's physical pain and suffering, and the general damages of grief, mental anguish, loss of affection, and companionship. Neither the parents, nor their trial attorneys, have produced evidence of mental or physical illness caused by Shawn's death, so I must rely on the general jurisprudence.
In Acy v. Aetna Cas. and Sur. Co., 499 So.2d 262 (La.App. 1 Cir.1986), $150,000 was awarded to a mother for the loss of her son in which there was evidence of a very close relationship. As the trial court stated in Acy:
It is always with great reluctance and trepidation that an appellate court reviews an award to a parent for the loss of a child. It is very difficult to try to tell a mother what her son is "worth" to her. However, as Judge Rubin noted in Caldarera v. Eastern Airlines, Inc., 705 F.2d 778 (1983):
The loss of a loved one is not measurable in money. Human life is, indeed, priceless. Yet the very purpose of the lawsuit for wrongful death is to fix damages in money for what cannot be measured in money's worth....
In Johnson v. Georgia Cas. & Sur. Co., 488 So.2d 1306 (La.App. 3 Cir.1986), the court surveyed jurisprudence from 1983, and concluded that in circumstances similar to these, our courts have been unwilling to award a parent in a death action more than $150,000. Johnson awarded the parents of a nineteen year old, who did not rely on their child for emotional and/or financial support, but rather had a "normal family relationship", the sum of $125,000 each. See also Pawlak v. Brown, 430 So.2d 1346 (La.App. 3 Cir.1983), wherein the court awarded $125,000 to each parent for the loss of their six year old son.
However, in the case here, the family was separated, did not live together, and apparently did not have a "normal relationship." Accordingly, considering all the factors, I believe that an award of $60,000, each, to Angela and Winston St. Hill for Shawn's death would be appropriate. As for Shawn's suffering prior to losing consciousness, I found no really comparable cases in the recent jurisprudence. However, in Johnson, supra, there was evidence that the decedent lingered from five to thirty minutes before losing consciousness following an industrial accident and the award for pain and suffering of $25,000 was affirmed. Similarly, in Taylor v. Charity Hospital of Louisiana in New Orleans, 466 So.2d 736 (La.App. 4 Cir. 1985), an award of $15,000 was given for the pain and suffering endured by a semicomatose child prior to her death. Under the present circumstances, I would find that an award of $15,000 is appropriate for Shawn's pain and suffering.
Evidence of the following expenses were admitted at trial:

Dr. Charles Steiner $ 425.00
West Jefferson General Hospital 2,499.20
Gertrude Geddes-Willis Funeral 3,352.41
Home
Therefore, the record supports the following
award of damages:
To Mr. and Mrs. Winston St.
Hill:
Medical Expenses
 Dr. Charles Steiner $ 425.00
 West Jefferson General
 Hospital 2,499.20
Funeral expenses 3,352.41
Shawn's physical pain and 15,000.00
suffering [to Mr. and Mrs.
Winston St. Hill]
Total award to Mr. and Mrs. $ 21,276.61
Winston St. Hill, jointly
General damages: Grief,
mental anguish, loss of affection,
companionship and
society:
 Mrs. Angela St. Hill $ 60,000.00
 Mr. Winston St. Hill 60,000.00
Total amount of judgment $ 141,276.61

Utilizing the comparative negligence standard, I would reduce the total award by 25%. Therefore, I would grant a total judgment of $105,957.46.
I would also award to plaintiff-appellants legal interest on the above amount from *790 date of judicial demand until paid, plus all costs of the proceedings.
Because of my findings above, I would find it unnecessary to address plaintiff's other assignments of error.
For the foregoing reasons, I would reverse the verdict of the jury and the judgment of the trial court and render judgment in favor of the plaintiffs, Mr. and Mrs. Winston St. Hill, as designated above.
I would also tax all costs of this appeal to defendants.
For the foregoing reasons, I respectfully dissent as outlined above.
NOTES
[1] By Mark McGowan, Shawn's friend.
[1] Art. 2323. Computation of Damages

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.