290 So.2d 779 (1974)
Harold CHAPMAN et ux.
v.
ARGONAUT-SOUTHWEST INSURANCE COMPANY et al.
No. 9678.
Court of Appeal of Louisiana, First Circuit.
February 11, 1974.
Rehearing Denied March 18, 1974.
Writ Refused May 17, 1974.
Thomas J. Malik, LaPlace, and Walton J. Barnes, Baton Rouge, for appellants.
Donald T. W. Phelps, Baton Rouge, for defendant St. Paul Fire & Marine Ins. Co.
Dr. Billy C. Michal and Dr. Andrew J. Wyly, Robert L. Kleinpeter, Baton Rouge, *780 for defendants Argonaut-Southwest Ins. Co. & Baton Rouge General Hospital.
Before LANDRY, ELLIS and PICKETT, JJ.
LANDRY, Judge.
This is a medical malpractice suit by Mr. and Mrs. Harold Chapman to recover damages for the death of their 34 month old daughter, Karen Chapman, which occurred during surgery, under general anesthesia, for recommended dental restoration due to extensive tooth decay known as "bottle baby caries". From judgment of the trial court rejecting their demands, plaintiffs have appealed. We affirm.
Named defendants are Dr. Andrew J. Wyly, Dr. Billy C. Michal, Baton Rouge General Hospital, Argonaut-Southwest Insurance Company (insurer of the hospital) and St. Paul Fire and Marine Insurance Company (Dr. Michal's insurer). On appeal, plaintiffs' claims are urged only against Dr. Wyly, Dr. Michal and Dr. Michal's insurer.
Appellants contend that the untimely demise occurred as a result of the combined negligence of Dr. Michal, DDS, a Pedodontist (general dentistry for children), who performed the surgery, and Dr. Wyly, Anesthesiologist, who administered anesthesia for the operation. Two basic contentions of negligence are advanced: (1) The child was improperly administered ¼ cc of Tensilon, while in respiratory distress, after completion of the surgery. It is contended the Tensilon aggravated a condition of impaired respiration deliberately induced at the start of the operation by the administration of a drug known as Anectine, which produces neuromuscular paralysis to facilitate intubation. Intubation is the insertion of a tube into the patient's nose or mouth for the dual purpose of administering anesthesia and/or assisting in respiration during surgery, should the latter become necessary. (2) The patient was prematurely removed from the operating room to the recovery room after administration of the Tensilon. In this regard, it is argued that failure of or deficiency in respiration was to be expected following the giving of Tensilon, therefore, the patient should have been kept under observation in the operating room where certain emergency equipment was available.
Appellants vehemently argue that the trial court incorrectly applied the "locality rule" in determining the issue of degree of care involved. It is appellants' position that in fields of medical specialty, as engaged in by Dr. Michal and Wyly, the locality rule does not apply, but rather specialists are held to the care and skill of the average member of the profession practicing the specialty, considering advances in the profession and taking into account geographical lack of facilities where such factor is relevant.
The child was examined by Dr. Michal on September 16, 1968, at which time she was 26 months old. The examination disclosed four severely decayed teeth and others with lesser cavities. No treatment was given. The patient returned March 12, 1969, at which time one tooth was removed under local anesthesia without incident. Surgery was recommended to correct all remaining work at one time, and was scheduled for May 8, 1969. Dr. Michal arranged for a preoperative examination which was performed May 7, 1969, by Dr. Joseph R. Hirsch, Pediatrician, who cared for Karen during her infancy. Dr. Hirsch's examination revealed the child's heart and lungs to be in good condition, but disclosed a marked sinus arrhythmia or irregular heartbeat upon inspiration, a condition normal to small children.
On the morning of May 8, 1969, the patient was admitted to Baton Rouge General Hospital and prepared for surgery. Preoperative medication prescribed by Dr. Michal and approved by Dr. Andrew J. Wyly, Anesthesologist, consisting of Demerol 25 mg, Vistaril 12½ mg and Atrophine 1/250th grain was administered at approximately *781 8:20 A.M. At about 9:00 A.M., the child was taken to surgery and anesthesized by Dr. Wyly, who used a mixture of Fluothane and oxygen as an anesthetic which he administered through a face mask. At about 9:30 A.M., the patient was injected intravenously with a 1½ cc of succinylcholine chloride, a drug bearing the trade name "Anectine", a muscle relaxant employed to aid nasal intubation. The patient was placed on assisted respiration for an undetermined period following which she resumed spontaneous breathing and assisted respiration was discontinued. At the onset of the operation, the child's heartbeat was approximately 140 per minute. The operation proceeded under general anesthesia. At about 10:00 A.M., the heartbeat rose to 160 per minute. At 10:20 A.M., Dr. Wyly noted the patient's spontaneous breathing was insufficient, at which time he began assisted respiration by means of a manually operated squeeze bag attached to the nasal tube, which mechanism provided the patient with both oxygen and anesthesia. Respiration was thusly assisted until discontinued as hereinafter shown. Meanwhile, the patient's heartbeat remained constant at 160 per minute until 10:45 A.M. The operation was completed at approximately 11:10 to 11:15 A.M.; the child remained in the operating room under assisted respiration until approximately 11:40 A.M., at which time she was given ¼ cc of Tensilon, intravenously, to restore spontaneous breathing. After receiving the Tensilon, the patient's heartbeat dropped rapidly to about 84 per minute. Immediately upon administration of the Tensilon, the child's breathing improved. Within a space of five to ten minutes, spontaneous breathing was restored, and her heartbeat rose to approximately 124 per minute. She was then observed for about 15 to 20 minutes in which interval she continued to breathe normally. Dr. Wyly then extubated the patient (removed the nasal tube), placed the child on a rolling stretcher, and proceeded to the rocervy room about 100 feet away, accompanied by at least one nurse and Dr. Michal, who followed behind the stretcher. En route, the group was joined by Mrs. Mable Monk, R.N., Operating Room Supervisor, who happened to be in the hall proceeding toward the recovery room. At or shortly prior to reaching the recovery room door, Dr. Wyly noted the child appeared not to be breathing properly. He felt her abdomen and detected no sign of respiration. He hurried into the recovery room and began assisted respiration with a device known as an ambubag, which is a hand operated contrivance designed to force room air into a patient. Dr. Wyly then called for a respirator which was put into use after the child was orally intubated. He also administered medication in an attempt to restore pulse and respiration but to no avail. The child died in the recovery room at approximately 12:50 P.M.
An autopsy performed by Dr. William S. Randall, Pathologist, resulted in his attributing the cause of death to adrenal insufficiency based on a finding that the adrenal glands were 1/5th normal size, and were therefore hypofunctioning. Dr. Randall explained that the abnormally small glands were incapable of producing sufficient adrenal fluids to sustain life under surgical stress.
As we understand appellants' position from the record and briefs filed herein, it is contended that anesthesiology is a medical specialty, therefore, Dr. Wyly, an anesthesiologist, is held to that degree of care and skill practiced by anesthesiologists generally, not merely in the local community, in this instance, Baton Rouge, Louisiana. The same argument is made with respect to Dr. Michal in that he holds himself out as a specialist in dentistry.
Appellants attempted to establish that, judged by the degree of care and skill practiced by the average anesthesiologist in the country, it was improper to administer Tensilon under the circumstances of this case. In addition, appellants sought to prove, judged by the standards of the average practitioner, Drs. Wyly and Michal *782 were negligent in removing the child prematurely from the safety of the operating room since they knew, or should have known, restored breathing following administration of Tensilon was probably temporary and further respiratory problems were to be anticipated.
It is conceded Anectine is a synthetic drug which operates differently from, but produces effects similar to those induced by natural curare, namely, the capacity to relax a patient by paralyzing the neuromuscular system. The drug produces almost instant relaxation and muscular paralysis lasting in most cases from three to five minutes. During this interval, the patient is unable to breathe spontaneously or unable to breathe sufficiently because of paralysis of muscles that operate the lungs and respiratory system. In this interval, respiration must be assisted. Anectine molecules are immediately attacked by an element in the blood plasma known as cholinesterase which breaks down Anectine into its components and destroys its efficacy. In the vast majority of cases, total dissipation of Anectine is achieved within 10 to 15 minutes, after which the patient breathes spontaneously. This initial result of Anectine is known in the medical profession as a Phase I Block. Although the advisability of giving Anectine is disputed, it is conceded that it is given by some anesthesiologists at the commencement of an operation to relax the patient so that intubation, either oral or nasal, may be accomplished with minimum trauma. It is admitted that, in this instance, Anectine was given for that reason.
It is agreed that assisted respiration must be furnished following administration of Anectine because the patient either ceases to breathe spontaneously or suffers impaired breathing until the initial effects of Anectine, known as a Phase I Block, wear off. The initial effects are characterized as a depolarizing block meaning the drug produces its results by blocking the muscle fibers by preventing further build up of the process of muscular contraction.
This mechanism is said to differ from the curare mechanism which operates on the nerve receptor endings of the muscles to produce blockage. A Phase I Block may turn into a Phase II Block which differs mechanically from a Phase I Block in that a Phase II Block is a nondepolarizing or desensitizing Block. Although different mechanically from a Phase I Block, a Phase II Block produces effects similar to those of a Phase I Block. A Phase II Block may result in a cessation or impairment of spontaneous breathing resumed following termination of a Phase I Block. It is agreed that between a Phase I and Phase II Block a "gray zone" may occur, meaning a transitional period in which some effects of the Phase I Block will linger. It is also conceded that, in exceptional cases, the effects of Anectine may linger indefinitely, perhaps for hours, depending upon the degree of deficiency of cholinesterase. So long as a Phase I Block continues, the patient must be kept on assisted respiration, and should not be given Tensilon as it will prolong the Phase I Block produced by Anectine. During a Phase II Block, a patient may experience either the loss or impairment of spontaneous breathing that has returned after the Phase I Block has ended. There is considerable dispute concerning the use of Tensilon either as a diagnostic aid to determine the existence of a Phase II Block or as a curative agent to restore Spontaneous breathing interrupted or impaired during a Phase II Block.
Appellants produced Dr. George A. Small, Anesthesiologist, Miami, Florida, whose sub-specialty is inhalation therapy, which is the treatment of pulmonary problems involving the chest and lungs, such as tuberculosis and emphysema. Dr. Small's training, experience and writings appear quite impressive. He is a Diplomate on the National Board of Anesthesiologists, and licensed to practice in Massachusetts and Florida. He conceded the properative medication was proper except that, in his opinion, the amount of Vistaril was twice what it should have been because Vistaril doubles the effect of narcotics, *783 and Demerol is a narcotic. In his opinion, it was unnecessary to give Anectine to intubate the child. He so felt because he considers Anectine a dangerous drug in that it sometimes produces prolonged paralysis and side effects harmful to a patient. In Small's opinion, there is a wrong and right way to administer medication, and the giving of Anectine followed by Tensilon was gross error. He stated that the better practice recognized everywhere is never give Tensilon to cure or reverse a Phase II Block. He conceded Tensilon might be given cautiously, slowly, and in small dosage to test for the presence of a Phase II or desensitizing Block. He explained that Tensilon breaks down the cholinesterase which inhibits Anectine thereby prolonging the effects of Anectine. In Dr. Small's opinion, Dr. Wyly mistakenly gave the patient Tensilon to reverse or cure what Dr. Wyly considered a Phase II Block. In so doing, the Tensilon temporarily relieved the child's respiratory distress, as shown by the chart which indicates that the heartbeat improved and spontaneous respiration resumed following administration of the Tensilon. This, according to Dr. Small, caused Dr. Wyly to mistakenly assume the Phase II Block was permanently reversed. Instead, when the effect of the Tensilon wore off after 15 or 20 minutes, the blockage resumed. Unfortunately, according to Dr. Small, the blockage recurred following extubation and while the patient was en route to the recovery room at which time no emergency equipment was immediately accessible. Had the difficulty arisen while the patient remained intubated in the operating room, she could have been immediately placed on assisted respiration until the blockage was dissipated by natural bodily processes, however long it may have taken. Dr. Small stated that if Dr. Wyly suspected a Phase II Block, he could have utilized either a block-aid monitor or called for a blood gas (acidosis) test. He stated, however, that he personally does not use a block-aid monitor, but prefers to use his own judgment in deciding whether or not a patient is in a Phase II Block. He also conceded that a blood gas (acidosis) test requires an interruption of surgery while a blood sample is sent to a laboratory for analysis.
In concluding the dosage of 1½ cc Anectine was excessive, Dr. Small relied upon his own judgment and writings, and also upon certain medical literature which was not introduced in evidence when objected to by defendants on the ground that its publication postdated the operation in question. Dr. Small disagreed with the autopsy which attributed death to adrenal insufficiency. He was of the firm opinion that death resulted from the combined negligence of Drs. Wyly and Michal in administering Tensilon, and thereafter failing to keep the patient under sufficent observation in the operating room where life saving devices were readily handy in the event of the emergency which should have been foreseen. It is clear from the tenor of Dr. Small's testimony that he considered this alleged negligence to be gross to say the least.
Dr. Vernon Haarstead, Ph.D., Professor of Pharmacology, Tulane Medical School, New Orleans, Louisiana, (who does not hold a medical degree), testifying for appellants, stated that in his teachings and writings, he warns that Anectine and Tensilon should never be given during the same operation, and that Tensilon should never be employed to overcome the effects of Anectine. He acknowledged a wide divergence of equally reputable medical authority concerning whether Tensilon should ever be used at all. He stated that, in his view, the only treatment for a patient suspected of continued respiratory distress due to Anectine is to breathe for the patient, keep the patient warm and wait for hours if necessary. In his view, no further medication should be attempted. Dr. Haarstead testified that Tensilon should not be given following Anectine because Tensilon has an adverse effect on the plasma cholinesterase which impairs the ability of the cholinesterase to break down Anectine thereby prolonging the effects of *784 Anectine. He conceded, however, that the effects of Tensilon are ordinarily short lived and usually dissipate completely in about 10 minutes. He also conceded that once the child's pulse rate ceased dropping following the administration of Tensilon and commenced rising again, the effect of the Tensilon was probably dissipated, and the drug had no further effect on the patient. Dr. Haarstead specifically stated it was gross error to give the Tensilon following Anectine. He believed that if Dr. Wyly suspected a Phase II Block, he should have refrained from giving Tensilon, and should have kept the patient in the operating room under assisted respiration for whatever time required to overcome the condition by bodily process.
The testimony of Dr. Andrew J. Wyly, M. D. Anesthesiologist, appears in the form of his discovery deposition taken prior to his death which occurred before trial. His education, training and experience is quite impressive, including service as an instructor at the Tulane School of Medicine. He was taught by Dr. Adriani, whose testimony is hereinafter considered. Dr. Wyly defended his procedure as being in compliance with good practice. He stated the preoperative medication was in order; that he customarily gave Anectine to aid in intubation, and that giving of Tensilon almost two hours after a single dose of Anectine was proper. He was of the opinion that the Tensilon did not cause or contribute to death, but rather the demise was due to the adrenal deficiency disclosed by the autopsy performed by Dr. Randall. Dr. Wyly conceded Tensilon should not be given to reverse a Phase I Block, but that there was no Phase I Block when he gave the Tensilon because the Anectine had long since ceased its effect. In effect, he stated the pulse rate drop and ensuing rise after administration of Tensilon was to be expected. He further testified that when the pulse rate rose to 124 after the patient resumed normal breathing following administration of the Tensilon, the patient was kept under observation in the operating room sufficiently long to convince him it was safe to remove the child to the recovery room. En route to the recovery room respiration ceased. At this point, he commenced resuscitative measures which proved fruitless.
Dr. William S. Randall, Pathologist, performed an autopsy on the child. He found the adrenal glands to be 1/5th normal for a child her age. In short, he concluded the glands were hypofunctioning and incapable of producing enough adrenal fluid to sustain life under surgical stress. He attributed death to postoperative cardiac arrest secondary to marked adrenal hypoplasia. Dr. Randall did not consider the possible effects of the medication administered, but based his opinion purely on his pathological findings.
Dr. Billy C. Michal, Pedodontist, testified in effect that the entire operation was routine until the patient failed to regain normal respiration after surgery was completed. He stated that the preoperative medication was proper and that at no time during the procedure did Dr. Wyly indicate the patient was in distress. He stated that after completing surgery and scrubbing up, he returned to the operating room and noted the patient was still under assisted respiration. Inquiry of Dr. Wyly disclosed the patient was either not breathing or not breathing enough. The patient was observed from 20 to 25 minutes. When her condition did not improve, Dr. Michal asked Dr. Wyly if something could be done. A discussion ensued as to the type of medication indicated. Dr. Wyly stated he would order an anti-curare drug or something of that nature. Wyly gave the medication and within a short time spontaneous breathing resumed. Dr. Wyly then observed the patient (how long Dr. Michal did not know), and then extubated the patient. During the procedure, Dr. Michal asked Dr. Wyly if other assistance might be in order, and Dr. Wyly responded there was no need. After extubating the child, she was removed from the operating room. On the way to recovery, the emergency *785 arose. Dr. Wyly then attempted proper resuscitative measures without avail.
Dr. John Adriani, M. D., an admitted expert in the field of Anesthesiology and Pharmacology, who teaches Pharmacology at L S U Medical School, New Orleans, Louisiana, testified on behalf of defendants. All of the experts agree that Dr. Adriani is world renowned in his field, and has probably done more drug research that any other individual. Dr. Adriani has written innumerable papers and treatises on pharmacology and drug research. His opinion is highly respected in the profession, including Drs. Small and Haarstead. Dr. Adriani confirmed that Anectine is widely used in the profession as a relaxant to aid in ease of intubation. He uses and recommends its use as a muscle relaxant. He considers Tensilon a good and useful drug. He concedes that Tensilon should not be used to counteract a Phase I Block, but is properly used to diagnose the presence or reverse the effects of a Phase II Block. Dr. Adriani reviewed the patient's entire record, including preoperative examination and medication, operative procedure, drug administration during surgery, postoperative care and treatment as disclosed by the anesthesia and surgical charts and records, and found no criticism whatsoever of any drug or procedure employed. He believed the patient was in a Phase II Block when the Tensilon was given because assisted respiration would otherwise have been continuous from the outset of the operation. He reached the conclusion that the patient went through the Phase I Block routinely because the charts indicate normal breathing was restored within a short time after the Anectine was given. This indicated the patient's cholinesterase was working properly and overcame the Phase I effect of the Anectine. He concluded that Dr. Wyly was justified in giving Tensilon to bring the child out of what Dr. Wyly evidently considered a Phase II Block. Dr. Adriani disagreed with Dr. Small and Dr. Haarstead's conclusion that Dr. Wyly was negligent. He was of the opinion that when the patient's pulse rate increased to 124 per minute after administration of Tensilon, Dr. Wyly properly concluded the effects of the Tensilon had worn off. Dr. Adriani also stated that, in his opinion, the record indicates that Dr. Wyly waited a sufficient time before removing the child from the operating room, although he conceded that had Dr. Wyly waited longer, the emergency might have occurred in the operating room. He stated in effect that, although Dr. Wyly made a mistake in concluding that spontaneous breathing had been permanently restored, Dr. Wyly was not negligent because he had observed the patient sufficiently long to justify the conclusion reached. Dr. Adriani explained that, in such instances, it is purely a matter of individual judgment of the observer which is all any anesthesiologist can do. Based on the pathologist's report of autopsy, Dr. Adriani concluded the patient died of cardiac arrest induced by adrenal deficiency.
Dr. Ben Kirby, M. D., anesthesiologist, Baton Rouge, in substance confirmed the propriety of the entire operative procedure according to accepted practice in the field of anesthesiology and postoperative care. He concluded there was no negligence in giving Tensilon almost two hours after administration of Anectine. He also concluded, on the basis of his examination of the entire medical record, that Dr. Wyly properly gave the Tensilon to diagnose and reverse a Phase II Block. He also concluded it was reasonable to extubate and remove the patient to recovery fifteen minutes after the giving of Tensilon which restored spontaneous respiration.
Plaintiffs concede the prevailing rule in this state is to the effect that a medical practitioner is not held to the highest degree of care, skill and knowledge, but is only required to exercise that degree of care and skill exercised by members of the same profession in good standing in the same community and to use reasonable care and skill along with his best *786 judgment in each individual case. Meyer v. St. Paul Mercury Indemnity Co., 225 La. 618, 73 So.2d 781.
Plaintiffs urge, however, that we abolish the "locality rule", and in its stead, adopt a rule prevailing in numerous states which holds a medical specialist to that degree of care, skill and knowledge exercised, practiced and possessed by the average member of the profession practicing the specialty. In support thereof, plaintiffs cite authorities from numerous jurisdictions including Brune v. Belinkoff, 354 Mass. 102, 235 N. E.2d 793; Pederson v. Dumouchel, 72 Wash.2d 73, 431 P.2d 973; Shier v. Freedman, 58 Wis.2d 269, 206 N.W.2d 166, 208 N.W.2d 328.
It is plaintiffs' position that in Favalora v. Aetna Casualty and Surety Company, 144 So.2d 544, this court approached the rule advocated by plaintiffs herein by holding that medical conduct, amounting to negligence per se, was actionable notwithstanding the practice was indulged in by members of the profession in a given locality.
Assuming we were disposed to apply the principle advocated by appellants, we find no basis in the record for doing so in this case. It is elementary that plaintiff must establish proof of his contentions by a preponderance of evidence. This record does not establish by a preponderance of evidence that specialists in the field of anesthesiology generally would regard the medication or treatment given in this case to be substandard or improper. We gather from the record that there is a vast difference of opinion among recognized experts concerning the use of Tensilon following Anectine. Plaintiffs have failed to establish that the profession in general considers the use of Tensilon improper under the circumstances involved herein. In this regard, we note that, based upon the reputation and credentials of the various experts, those of Dr. Adriani appear to be the most widely accepted in the profession.
Neither do we find that Favalora constitutes application or recognition of the specialist rule advocated by plaintiffs. Favalora held that the locality rule could not be used to relieve from liability a medical practitioner who indulged in a practice deemed negligent under the ordinary rules of negligence. Stated otherwise, Favalora stands for the proposition that conduct amounting to negligence per se cannot be excused on the ground that all members of the medical profession in a community engage therein.
The rule in Favalora is clearly inapplicable here. In this instance, the record shows that the giving of Tensilon was proper according to local standards, and also pursuant to certain recognized authority which is universally held in high regard in the medical field. Plaintiffs urge our rejection of the locality rule in this case on the ground that the procedure followed does not accord with the general requirements of the average specialist in the field. It suffices to say that plaintiffs have failed the burden of proof. At most, plaintiffs have established only that there is a wide divergence of opinion among members of the specialty involved concerning a matter which is largely a judgment factor.
The record, in this instance, discloses that neither the giving of Tensilon, the amount given, nor removal of the patient from the operating room constituted medical malpractice. On the contrary, the clear preponderance of evidence is to the effect that both actions were proper and in keeping with local standards of care practiced by anesthesiologists and surgeons in the Baton Rouge area. Moreover, it appears the procedures were in accord with the teachings and writings of certain well known authorities in the field whose views are respected and followed in other areas of the state as well as throughout the United States. Granted some authorities are in disagreement. Nevertheless, the procedure followed herein is sanctioned by authorities equally as qualified and as *787 highly regarded as plaintiffs' experts, if not more so.
From the record, we conclude Dr. Wyly was faced with a judgment decision in removing the patient to recovery. We also conclude that, under the circumstances, his judgment was reasonable and in keeping with acceptable standards of care which are sanctioned by local medical authority in the same field. We cannot find that under Favalora, above, said practice amounted to negligence per se. On the contrary, in this instance, it appears the procedure is shown to be based on knowledge and experience which has demonstrated its reliability over a period of years.
The judgment of the trial court is affirmed at appellants' cost.
Affirmed.