630 So.2d 888 (1993)
Medrick KENNEDY, Jr.
v.
ST. CHARLES GENERAL HOSPITAL AUXILIARY, et al.
No. 92-CA-2790.
Court of Appeal of Louisiana, Fourth Circuit.
December 30, 1993.
Writ Denied March 18, 1994.
*889 Lawrence J. Smith, Lawrence J. Smith & Associates, New Orleans, for plaintiff/appellant.
George E. Cain, Luis A. Leitzelar, Dwight C. Paulsen, III, Lemle & Kelleher, New Orleans, for defendants/appellees.
Before KLEES, ARMSTRONG and JONES, JJ.
JONES, Judge.
Plaintiff, Medrick Kennedy, Jr. appeals a jury verdict and judgment rendered in favor of the defendant, Louisiana Patient's Compensation Fund (LPCF) dismissing his action for damages for injuries suffered as a result of suffering a stroke while undergoing a three vessel angiogram. The angiogram had been recommended by Dr. Patricia Cook and was performed by Dr. S. William Schwartz. Prior to trial, the plaintiff settled his claims against Drs. Cook and Schwartz. Thus the only remaining defendant at the trial of the case was the LPCF. On appeal plaintiff argues that he established a case for liability against the underlying health care providers, Drs. Cook and Schwartz, thus the judgment in favor of the LPCF was clearly erroneous.

FACTS
Plaintiff, Medrick Kennedy, Jr. filed a medical malpractice action against St. Charles General Hospital, Dr. Arnold M. Lupin, Dr. Cook, and Dr. Schwartz alleging the following facts:
Plaintiff was admitted into the Hospital as a patient of Dr. Lupin on May 15, 1986 complaining of headaches which he had been experiencing for several days preceding admission. Plaintiff was examined by Dr. Lupin, *890 Dr. Cook, and Dr. Schwartz and a recommendation was made that he undergo a three vessel angiogram, even though, according to plaintiff, said angiogram was not medically indicated. On May 19, 1986 defendants negligently performed the angiogram on the plaintiff causing severe medical and physical injuries, more specifically plaintiff suffered a severe stroke, paralysis and other injuries. Consequently the instant litigation ensued.
Prior to trial on the merits, St. Charles General was granted a summary judgment and dismissed with prejudice. Additionally, Drs. Lupin and Schwartz were initially voluntarily dismissed from the litigation by the plaintiff. However, plaintiff later filed a motion for leave to amend and set aside the dismissal against Dr. Schwartz. Plaintiff alleged that Dr. Schwartz had been dismissed earlier because of no expert testimony showing he was negligent. However, plaintiff alleged that he now "realized that there is also an issue of lack of informed consent." Since Dr. Schwartz was the person who obtained the plaintiff's consent to the three-vessel procedure, he would be liable for any lack of informed consent. Thus, plaintiff sought permission to file a second supplemental and amending petition raising the issue of informed consent and adding Dr. Schwartz as a defendant. The trial court granted the plaintiff's motion, allowed the plaintiff to file the second supplemental and amending petition and set aside the previous order dismissing Dr. Schwartz.
Prior to trial, the plaintiff settled his claims against the two doctors, releasing both physicians for the sum of $75,000. Thus the only remaining active defendant at the trial of the case was the LPCF.[1]
Testimony adduced at the trial of the case established that the three vessel angiogram had been recommended by Dr. Cook, ordered by Dr. Lupin, and performed by Dr. Schwartz. The consent to the procedure had been obtained by Dr. Schwartz. No testimony was adduced to indicate that the procedure was negligently performed. In fact, the parties conceded that there was no evidence that the procedure was performed negligently. Thus, the sole issues before the jury were 1) whether Dr. Cook was negligent in ordering the three vessel angiogram and 2) whether Dr. Schwartz gave the plaintiff enough information about the three vessel angiogram to enable the plaintiff to make an intelligent decision on whether to undergo the three-vessel angiogram.
Following a trial on the merits, the jury returned a verdict in favor of both Drs. Cook and Schwartz. Judgment was entered by the trial court in accordance with the jury verdict dismissing plaintiff's claim against the LPCF and plaintiff subsequently filed this appeal.

DISCUSSION AND LAW
On appeal the plaintiff argues that he established that the health care providers, Dr. Cook and Dr. Schwartz failed to obtain informed consent for the three vessel angiogram; thus, the jury verdict should be reversed. He also argues that the trial judge gave erroneous jury instructions rendering the decision of the jury and the judge in favor of the LPCF erroneous. Since the judgment rendered by the jury was based on an erroneous jury instruction, plaintiff argues that this court should examine the record, make independent findings and render a judgment awarding damages. Further, in a reply brief he argues that the record contains evidence of "jury tampering." Having reviewed the record, we affirm the judgment rendered in favor of the defendant, LPCF.

INFORMED CONSENT
Louisiana's Informed Consent Statute, La.R.S. 40:1299.40 and the jurisprudence of this state recognize the right of a patient to determine what shall be done to his or her own body. Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988); LaCaze v. Collier, 434 So.2d 1039 (La.1983). Pursuant to the doctrine of informed consent physicians are required to provide patients with sufficient information to permit the patient to make an *891 informed and intelligent decision on whether to submit to a proposed course of treatment. In Hondroulis v. Schuhmacher, supra, at 411-412, the court stated:
The doctor's duty is to disclose all risks which are "material". In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
There must be a causal relationship between the doctor's failure to disclose material information and material risk of damage to the patient. Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed.
[Citations omitted]
Based on these principles, the court in Hondroulis concluded that the presumption of informed consent contained in the informed consent statute was not a conclusive presumption. Thus, the mere fact that the physician established that the plaintiff had signed a consent form tracking the language in the statute was not sufficient to justify the granting of the defendant's summary judgment motion where the plaintiff's petition included allegations that she was never told of certain material risks.
Unlike Hondroulis and other informed consent cases, this case contains no indication that the doctor failed to disclose that there was a risk of stroke, that the risk was material, and that the risk materialized. It is undisputed that the plaintiff signed a consent form acknowledging that he understood that paralysis, brain damage, death, and loss of the function of an arm or leg were known risks associated with the three-vessel angiogram. Further, Dr. Schwartz specifically informed the plaintiff orally of the possibility of stroke and brain damage. Dr. Schwartz testified that he drew a diagram and specifically described the procedure to the plaintiff.
Plaintiff asserts that in order to establish that informed consent was given in the instant case, Hondroulis requires that the physician prove that a) he told the patient about the safer alternative of a one or two vessel angiogram, b) that he gave the patient the percentages for the risk of stroke being realized, and c) that he told the patient that a new risk of stroke existed each time a new vessel was examined.
In his first assignment of error plaintiff argues that the jury erred in finding for the defendant Dr. Schwartz on the issue of lack of informed consent because pursuant to the U.S. Constitution and the Louisiana Constitution a physician cannot withhold material information about a safer alternative even if in his judgment the alternative is not medically acceptable. In this respect, he argues *892 that the safer alternative of a one vessel angiogram was not offered to him, thus informed consent to the three vessel angiogram was never obtained.
Encompassed in the definition of material risks is the concept that in order for a patient to make an informed, intelligent decision, he must be advised of any alternatives to the proposed procedure. Thus the physician must inform the patient of any alternatives that exist to a surgical procedure. If plaintiff's assertion that a one or two vessel angiogram was a safer alternative than a three vessel angiogram is correct and this information was not conveyed to the plaintiff, informed consent was not obtained for this procedure.
The record supports plaintiff's contention that neither Dr. Schwartz nor Dr. Cook discussed the matter of a one or two vessel angiogram with the patient. Both physicians, as well as all the expert witnesses for the defendants testified that they routinely performed only three vessel angiograms since an examination of fewer vessels than three was considered an incomplete procedure. These physicians did not believe a one or two vessel angiogram was an appropriate procedure. Only one doctor, Dr. Bott, the plaintiff's expert testified that performance of a one vessel angiogram would have been a safer alternative. However, even Dr. Bott conceded that a physician does not have to offer a patient a procedure which he believes is improper. We know of no jurisprudence which requires a physician to advise a patient of a procedure that he believes is not appropriate or medically indicated.
The burden of establishing that the one vessel angiogram was a safer alternative rested with the plaintiff. The evidence does not support a finding that the plaintiff met this burden.
In his second assignment of error, the plaintiff argues that Dr. Schwartz did not obtain informed consent because he failed to explain the inherent risks involved in the test, giving percentages. Plaintiff cites Hondroulis to support his argument that percentages are required. However, nowhere in Hondroulis does the court specifically state that percentages must be given to the patient in order to support a finding of informed consent. The only language in Hondroulis which could conceivably be interpreted as requiring percentages is the following:
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. LaCaze v. Collier, 434 So.2d at 1043, 1045; Canterbury v. Spence, supra [464 F.2d 772] at 789 [ (D.C.Cir.1972) ]; Louiselle & Williams, Medical Malpractice, 1981, Sec. 22.01 at 594.44; Prosser & Keeton, supra, p. 190; see Sard v. Hardy, 281 Md. 432, 379 A.2d 1014 (1977); Crain v. Allison, 443 A.2d 558 (D.C.App.1982); Miller v. Van Newkirk, 628 P.2d 143 (Colo.App.1981); Truman v. Thomas, 27 Cal.3d 285, 165 Cal.Rptr. 308, 611 P.2d 902 (1980).
Hondroulis, at 411.
We find nothing in the above cited language that mandates the giving of percentages of risks for surgical procedures. Indeed, our courts have traditionally recognized that medicine is an inexact science. Sharkey v. Sterling Drug, Inc., 600 So.2d 701, 712 (La.App. 1st Cir.1992), writ denied, 605 So.2d 1099 (La.1992) and writ denied, 605 So.2d 1100 (La.1992); Howell v. Iacona, 505 So.2d 821, 828 (La.App. 2nd Cir.1987). As such, the notion that the physician can give accurate percentages for a risk being realized in a surgical procedure is foreign to the field of medicine. The fallacy of establishing a rule requiring physicians to give patients percentages of risks in the procedure at issue is poignantly underscored by the testimony of the various expert witnesses in this case. Dr. Botts, the plaintiff's expert testified that the risk of causing a stroke in a carotid angiogram was "highly variable and depends on the center and the radiologist doing it." He further stated "You can see figures like one in five thousand, but more typically half of one percent or one in two hundred people have a stroke from the procedure." *893 He also testified that he did not know what the average was but it was somewhere between one in a hundred and one in several hundred. Dr. Errol Genet testified that he had performed hundreds of three vessel angiograms.[2] Of the 2500 angiograms that he estimated he had performed in his 20 years of practice, he knew of only one angiogram patient who suffered a stroke. Having reviewed the testimony and other documents in the record, we find that the plaintiff failed to prove that it was possible for Dr. Schwartz to give him definite percentages of the risks of a stroke occurring while undergoing a three vessel angiogram. Rather, since the figures undoubtedly vary, Dr. Schwartz could very well have been faced with a charge of misrepresentation had he given a percentage later determined to be inaccurate.
Plaintiff's reliance upon Hondroulis, supra, and Hidding v. Williams, 578 So.2d 1192 (La.App. 5th Cir.1991) for the view that giving percentages of risk is required in order for informed consent to be valid is misplaced. In those cases, the court examined the statistical incidence of a particular risk being materialized in order to determine if the risk was a material one. The purpose of determining whether the risk was material was simply to know if it was a risk that had to be disclosed. At no time did the courts suggest that physicians must give patients the percentages of a risk being realized. Here, no one questions the fact that the possibility of the plaintiff suffering a stroke was a material risk of the procedure; however, this risk was in fact disclosed to the plaintiff. Plaintiff's argument that the failure of Dr. Schwartz to quote definite percentages negates a finding of informed consent has no merit.
In his third assignment of error, plaintiff argues that the jury erred in finding for defendant, Dr. Schwartz, on the informed consent issue where the defendant never informed plaintiff that in the three vessel angiogram there is a risk of 1 in 100 to 1 in 200 of stroke for each vessel examined, and that stroke can result in serious brain damage with resulting paralysis, blindness, and even death. In this assignment of error, plaintiff raises the question of the extent to which the physician must detail to the patient each and every place in the medical procedure that a known risk may be realized. Plaintiff cites no authority for this novel but appealing proposition. While we believe that detailed information concerning when a risk may be realized is desirable and should be given, no jurisprudence has been found which mandates such a disclosure in all cases, irrespective of the circumstances of the individual cases. The record clearly reflects that the plaintiff was told of the risk of stroke and death. For this reason, we find that this assignment of error has no merit.
Neither the evidence nor the jurisprudence supports a finding that defendant Dr. Schwartz withheld any material information from the plaintiff or failed to obtain informed consent. On the contrary, the record clearly supports the conclusion that Dr. Schwartz obtained a fully informed consent pursuant to Louisiana's Informed Consent Statute, La. R.S. 40:1299.40 which states:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the *894 consent was induced by misrepresentation of material facts.

The plaintiff signed a consent form which indicated that he had been told of the risks of brain damage, paralysis, death, and loss or loss of function of an arm or leg. Absent a showing that this signed consent was induced by a misrepresentation, a rebuttable presumption exists that informed consent was obtained. No testimony was introduced to show that the plaintiff's consent was induced by misrepresentation. The plaintiff was not present to testify on the day of trial.[3] The only person to testify concerning the conversation on consent which occurred between Dr. Schwartz and the plaintiff was Dr. Schwartz. Dr. Schwartz testified that he told the plaintiff that the procedure could cause paralysis or stroke. The fact that he failed to suggest to the plaintiff that performing a one or two vessel angiogram would be a safer alternative does not constitute a misrepresentation where the testimony of five experts support a finding that a one or two vessel angiogram was not appropriate. The fact that Dr. Schwartz failed to explain the risk of stroke giving percentages does not constitute a misrepresentation, particularly where the record indicates it is not possible to give accurate percentages. Finally the fact that he did not tell the plaintiff that a new risk of stroke existed each time a new vessel was examined did not constitute a misrepresentation. Absent a showing that Dr. Schwartz failed to accurately answer any questions posed by the plaintiff or that disclosure of this information would have caused a reasonable person to forego the procedure, no basis exists for finding that failure to disclose this information constituted a misrepresentation. Thus, the record contains no information to rebut the presumption that a valid informed consent was obtained. In fact, even the plaintiff's own expert, Dr. Bott stated that he did not think Dr. Schwartz was "at all at fault" and that Dr. Schwartz "probably got a good informed consent, based on what information he had at the time."

JURY INSTRUCTIONS
In his fourth assignment of error plaintiff argues that the trial judge erred when on his own volition and without any Louisiana law to support him, he instructed the jury as follows:
If you find from the credible evidence that medical science recognized more than one method of treatment for Mr. Kennedy's condition, then you are instructed that Dr. Cook was at liberty to select any of those methods. She was not at fault merely because she made a choice of a recognized alternative method of treatment, if she exercised the required care, skill, and judgment in following the method of her choice. This would be true even though other medical witnesses may not agree with them on the choice she made.
By suggesting that the jury could find that medical science recognizes more than one treatment for the plaintiff's condition, plaintiff argues that this charge literally took away the jury's option of finding Defendant Dr. Cook negligent.
The defendant maintains that existing case law supports the giving of this charge. More specifically defendant argues that in Moore v. Healthcare Elmwood, Inc., 582 So.2d 871, 878 (La.App. 5th Cir.1991) and Soileau v. HCA Health Servs. of La., Inc., 539 So.2d 662 (La.App. 3d Cir.1989) the courts stated that when the plaintiff's expert testifies that he would have performed a different procedure than the one used by the defendant, which is less common, but accepted, the plaintiff has failed to prove a deviation from the standard of care. Additionally, if the treating physician follows a course of action "sanctioned by authorities equally as qualified" as those with opposing views, and his judgment is reasonable in keeping with acceptable standards of care, then the treating physician has been shown to have acted with *895 reasonable care and diligence. Chapman v. Argonaut Southwest Ins. Co., 290 So.2d 779, 786 (La.App. 1st Cir.1974), writ denied, 294 So.2d 550 (La.1974). When faced with several acceptable courses of treatment, a physician is not negligent for failing to choose a course of treatment which, at a later time, may be shown to be a wiser course. Caldwell v. Parker, 340 So.2d 695 (La.App. 4th Cir.1976), writ denied, 342 So.2d 1120 (La. 1977) For these reasons, defendants assert that the case law given in these cases support the jury charge given by the trial court in this instance. We disagree.
In the cited cases you had testimony of experts that indicated that two methods or approaches were acceptable, that nothing was necessarily wrong with the approach or procedure used by the accused physician, but that the testifying physician would have used a different approach. In the instant case the plaintiff's expert, Dr. Bott testified that it was negligent to continue with a three vessel angiogram when a one vessel angiogram was a safer alternative. Conversely, the defendants' experts testified that no basis existed for doing an angiogram if it wasn't going to be a three or four vessel angiogram because such a procedure would be incomplete. These experts maintained that it would have been inappropriate to do a one vessel angiogram. In essence, you had conflicting opinions on what the appropriate procedure would be. For this reason, it was incumbent upon the jury to determine which procedure was appropriate.
By wording the charge as he did the trial judge unwittingly suggested to the jury that both methods were acceptable. The charge was clearly erroneous where none of the evidence supports a finding that both methods were acceptable practices. The fact that the trial judge prefaced the charge with the preposition if did not remove the prejudicial suggestion that both types of procedure could be considered appropriate. A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of a particular case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 455 (La.App. 4th Cir.1986). In order to fulfill that duty, he must both require that the jury consider only the correct law and avoid confusing the jury. Cuccia v. Cabrejo, 429 So.2d 232, 235 (La.App. 5th Cir.), writ denied, 434 So.2d 1097 (La.1983). The trial court's legal error in charging the jury tainted the fact finding process and prejudiced the defendant. Thus we reverse the finding of the jury affected by the erroneous jury charge and undertake a de novo review of the record. Rosell v. ESCO, 549 So.2d 840 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).
The only finding that could have potentially been impacted by this erroneous instruction was the finding of no negligence on the part of Dr. Cook. Thus this court must decide whether Dr. Cook was negligent in recommending the performance of the three vessel angiogram.
In a medical malpractice action, the burden of proving negligence on the part of a physician is on the plaintiff. In order to meet that burden, the plaintiff must establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty. Additionally he must establish a causal relationship between the alleged negligent treatment and the injury sustained. La.R.S. 9:2794. In attempting to meet this burden, the plaintiff presented the testimony of only one expert, Dr. Bott, a neurologist who maintains a practice in Oakland, California. He testified that he felt that Dr. Cook had mismanaged the plaintiff's case for several different reasons. Initially, Dr. Bott testified that before ordering an angiogram, community standards, "at least in California and Colorado" dictated that a contrast enhanced CT scan be obtained since no risk of stroke existed with that procedure. However, when confronted with the medical records showing that a CT scan was performed three days after the failed angiogram and the results were negative, Dr. Botts conceded that a CT scan with contrast would not have shown anything. Next he questioned whether the plaintiff should have been checked for glaucoma. However, on further questioning, Dr. Botts admitted that he had not mentioned this opinion in his previous deposition as he only recently reached that *896 conclusion. Moreover, a review of the medical records reveals no facts suggesting that any of the plaintiff's problems were related to glaucoma. More importantly, Dr. Bott maintained that it was negligent to order a three vessel angiogram when a one or two vessel angiogram was a safer alternative. The testimony of the defendant's experts directly contradicted the testimony of Dr. Bott. They testified that it would have been inappropriate to do a one or two vessel angiogram. All testified that they routinely only performed three vessel angiograms and that performance of a one or two vessel angiogram would have been an incomplete procedure because the purpose of the procedure was to get a complete picture of what was going on and either a three vessel or four vessel angiogram was required to obtain this information. Dr. Bott acknowledged that a number of neurologists believe that any angiogram other than a three or four vessel angiogram was incomplete. He opined that this was illogical, and in his opinion, negligent. Yet at one point during his testimony he conceded that the number of neurologists who perform three and four vessel angiograms may exceed fifty percent. The testimony of the plaintiff's expert and the defendants' experts were diametrically opposed. Based on these facts, we find the plaintiff did not meet the burden of proving that Dr. Cook was negligent in recommending the performance of the three-vessel angiogram.[4]
In his fifth assignment of error the plaintiff argues that the trial judge erred in refusing to give in whole or in part Plaintiff's Jury Charges 25, 26, and 27.
Plaintiff's requested jury charges 25, 26, and 27 relate to standard of care. These requested charges basically would have required the trial judge to tell the jury that a negligent local standard of care cannot shield a health care provider from liability. Plaintiff argued that this requested jury charge was permissible under Favalora v. Aetna Cas. & Surety Co., 144 So.2d 544 (La.App. 1st Cir.1962). We disagree. In Ware v. Medical Protective Ins. Co., 621 So.2d 54 (La.App. 2 Cir.1993) the court noted that by enacting Act 807 of 1975, which became La. R.S. 9:2794, the legislature abrogated the locality rule with respect to medical specialist, directing instead that their duty be gauged by that degree of care ordinarily practiced by others involved in the same specialty. Thus, the locality rule is no longer applicable to claims against a specialist. Moreover, having reviewed the trial record, we note that all of the medical experts who testified in this case testified as specialist practicing pursuant to national standards, not local standards. Thus, no basis existed for giving the requested jury instructions.
The trial judge is under no obligation to give any specific jury instructions that may be submitted by either party. Doyle v. Picadilly Cafeterias, 576 So.2d 1143 (La.App. 3rd Cir.1991). As long as the jury instructions given are fair and reasonably point up issues and provide correct principles of law for the jury to apply to the issues, adequacy of the instructions will be determined by reviewing the jury instructions as a whole. The special charges given by the judge on standard of care were adequate. Thus, we find no error in the trial court's failure to give jury charges 25, 26 and 27.
In his sixth assignment of error, the plaintiff argues that the trial judge erred in giving a confusing jury charge on informed consent which did not detail the informed consent law as set out in Hondroulis, supra, and as requested in Requested Jury Charges 35-37.
When read as a whole the jury instructions on informed consent given by the trial judge fairly and reasonably delineated the issues and applicable principles of law. Thus the failure to give the requested special jury charges was not error. Doyle v. Picadilly Cafeterias, supra. Additionally, a review of the trial record reveals that it was the defendant who submitted jury charges 35-37, and it was the defendant who objected to the judge's failure to give those charges. The record contains no evidence to support the fact that plaintiff objected to the failure *897 of the court to give requested jury charges 35-37. Plaintiff did submit a jury charge request # 28 which he alleged was submitted in response to defendants' jury charges 35-37. Since the trial judge declined to give defendants' jury charges 35-37, no basis existed for giving plaintiff's charge # 28, particularly since the charge given by the trial judge on the issue of informed consent was adequate. For this reason, the plaintiff has no basis for challenging the action of the trial judge refusing to give these requested charges.

JURY TAMPERING
In an additional assignment of error raised in his "reply brief", plaintiff argues that the trial judge erred by answering a question contained on a note from the jury, without giving the parties a chance to object. Plaintiff argues that these actions constitute jury tampering, thus serving as grounds for reversal.
The note forming the basis for this assignment of error states:
If the doctor has several choices and decides on one choice and all are within the medical remedies of medicine but it turns out wrong, you must not hold the doctor at fault?
At the bottom of the note is the remark "That is correct".
The record contains no evidence to support plaintiff's argument that the trial judge answered a question from the jury ex parte. Indeed plaintiff admits in his brief that it is unknown who wrote the note and/or who responded. For this reason this court will not presume that the judge and/or his clerk must have answered a question from the jury absent some credible evidence to support such an allegation. In a civil case the burden of establishing that an ex parte communication between the trial judge and jury occurred and that it prejudiced them is on the moving party. St. Hill v. Tabor, 532 So.2d 776, 780-781 (La.App. 5 Cir.1988), rev'd on other grounds, 542 So.2d 499 (La. 1989). Plaintiff failed to establish that an ex parte communication took place. Thus, this assignment of error has no merit.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] For purposes of determining whether the LPCF was liable, Dr. Schwartz and Dr. Cook remained in the case as nominal defendants only.
[2] Dr. Genet was a member of the Medical Review Panel which reached the unanimous opinion that all three of the physician defendants had complied with the standard of care.
[3] On the day of trial, the plaintiff's wife testified that he was currently hospitalized at Tulane Medical Center on a respirator. The hospitalization was apparently caused by complications arising from Lou Gehrig's disease, an illness that the plaintiff developed in January of 1991. The parties stipulated that the development of the Lou Gehrig's disease was not related to the angiogram.
[4] Since the plaintiff suffered the stroke shortly after the catheter was placed in the second vessel, the procedure was terminated immediately before the second vessel could be examined completely. For this reason, the plaintiff did not have the complete three vessel angiogram.