542 So.2d 499 (1989)
Angela Gonzales, Wife of/and Winston A. ST. HILL
v.
Carolyn Kass TABOR a/k/a Carolyn Falgout and State Farm Fire and Casualty Company.
No. 88-C-3042.
Supreme Court of Louisiana.
May 1, 1989.
Morris Reed, Edward Drury, New Orleans, for applicants.
Daryl Higgins, Windhorst, Gaudry, Talley & Ranson, Gretna, for respondent.
MARCUS, Justice.
On May 11, 1985 Carolyn Falgout hosted at her home a graduation party honoring her son Steven Tabor who had received his GED degree. The invitations made by Steven called the party an "Anything Goes Pool Party." These invitations were distributed by a friend of Steven's to students at John Ehret High School, which Steven had at one time attended. In addition, other invitations were issued verbally. About 150 guests attended the party, ranging in ages from sixteen to twenty and including about twenty adult friends of the Falgouts. Several guests, including Steven Tabor and his sister, were certified life guards. However, no one in particular was assigned to act as life guard for the evening. The morning of the party, Steven and his brother-in-law cleaned the Falgout pool and added extra chlorine in anticipation of the large number of guests expected to attend and to swim. Mrs. Falgout prepared and served 500 hot dogs the evening of the party. She also provided soft drinks for the guests. Steven's father and uncle each bought a keg of beer and Steven made a batch of "jungle juice" which contained, among other ingredients, two bottles of rum. One of the guests brought "spiked watermelon" to the party. No one was asked to furnish proof of age before getting either beer or "jungle juice." However, *500 Mrs. Falgout arranged to have a police officer present to make sure that if anyone drank he did not leave the party drunk or he got a ride home rather than drive himself. In addition, the officer was to insure that general order was kept and that no fights broke out or problems arose with party crashers.
The guests began arriving at the Falgout home about 7:00 P.M. The party took place in the back yard where the swimming pool was located and where a friend of the Falgout family had set up his stereo system to provide music for the party and to act as disc jockey. The stereo was about fifty feet from the swimming pool and the music was moderately loud. The main activity of the evening centered around the swimming pool where as many as thirty guests were swimming at one time. The pool, which was twenty-two feet wide and thirty-two feet long, ranged in depth from three and a half feet to ten feet. Near the shallow end was a "sliding board" and at the deep end there was a diving board. The various depths were marked on the side of the pool, but there was no rope divider between the deep and shallow ends. The lighting surrounding the pool consisted of lights attached to the side of the house, two underwater lights and one large spot light attached to a camper van parked about fifty feet from the pool. At some point during the party, the swimmers began to engage in horseplay around the pool. This horseplay lasted anywhere from ten minutes to an hour and involved pushing, shoving, and throwing of certain guests into the pool. Some of these "victims" were fully clothed, but most were wearing swimming attire. Early in the evening the water in the pool was clear, but it became cloudy as the evening progressed due to the number of people in the pool, people being thrown in wearing street clothes, dirt and grass from the area surrounding the pool being tracked into the pool, and watermelon being thrown into the pool. By the end of the party at 11:00 P.M., the water was so cloudy that the bottom of the pool was not visible even though there was some underwater lighting.
Shawn St. Hill, sixteen years old at the time of the graduation party, planned to attend. Both of his parents were out of town that weekend and he was left by himself. This was not abnormal because Mrs. St. Hill had been living in Baltimore, Maryland, for about a year and a half due to her job and Mr. St. Hill was employed as an offshore worker which required him to spend about seven days offshore and seven days onshore. The weekend of the Falgout party both Mr. and Mrs. St. Hill were in Baltimore. Before his father left for the weekend, Shawn told him that he was planning to go to a swimming party. When his father reminded him that he did not swim, Shawn told him not to worry. The fact was that Shawn did not know how to swim, but nevertheless went to the Falgout swimming party, changed from his street clothes into swimming attire, and entered the pool. He was seen going down the "sliding board," playing in the shallow end of the pool, hanging on to the side in the deep end and participating in some of the horseplay during which he threw a friend into the pool at least twice and was himself thrown in the pool twice before he told that individual that he could not swim. At about 10:00 P.M. Steven Tabor and some of the other guests decided to hold a diving competition. After several dives, Steven did a flip and went feet first into the water and all the way to the bottom of the pool. While under the water he felt an arm and then saw Shawn submerged. Steven struggled to the surface holding Shawn and called for help. Several people aided him in pulling Shawn out of the water. CPR was immediately begun and an ambulance was called and arrived within minutes. Nevertheless, efforts to revive Shawn both poolside and in the hospital were futile.
An investigation into Shawn's drowning death shed little light on the cause of the drowning. No one remembered seeing him immediately before the drowning nor could the investigating officer determine how he came to be in the deep end of the pool. As evidenced by the fact that his heart did respond to electrical shock administered *501 when he was brought into the hospital, Shawn probably had been submerged only a few minutes prior to being pulled from the pool. An autopsy revealed that he had been alive when he entered the water and that his death was by drowning. The autopsy further showed that his blood alcohol level was 0.028 percent, well below the level of 0.10 percent at which a person is legally deemed intoxicated. An analysis of the vitreous or eye fluid revealed a 0.055 percent level of drinking alcohol.
Mr. and Mrs. St. Hill, parents of Shawn, brought suit against Mrs. Falgout, State Farm Fire and Casualty Company (her primary insurer) and Aetna Casualty and Surety Company (her excess insurer). Defendants answered generally denying the allegations of plaintiffs' petition and affirmatively asserting that the accident was caused by the negligence of Shawn. Prior to trial, State Farm settled plaintiffs' claims against it and Mrs. Falgout for $100,000 (policy limits) with the reservation of plaintiffs' rights against Aetna. Judgment was rendered dismissing the suit against State Farm and Mrs. Falgout "up to $100,000."
After trial, the jury found that Mrs. Falgout was not negligent and the court entered a judgment in favor of defendants, Mrs. Falgout and Aetna, and against plaintiffs, dismissing plaintiffs' suit at their cost. Plaintiffs appealed. The court of appeal affirmed with one judge dissenting.[1] Upon plaintiffs' application, we granted certiorari to review the correctness of that decision.[2]
The standard of conduct required of persons in Louisiana in their relationships with one another as a basis of delictual liability is set forth in La.Civ.Code arts. 2315 and 2316.
Article 2315 provides in pertinent part:
Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.
Article 2316 provides:
Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill.
Accordingly, under these articles the elements of a cause of action are fault, causation and damage. The conduct of which the plaintiff complains must be a cause-in-fact of the harm. After determining causation, the court must also determine what was the duty imposed on defendant, and whether the risk which caused the accident was within the scope of the duty. A breach of a duty on the part of the defendant which was imposed to protect against the risk involved makes the offender negligent under the above articles. Gresham v. Davenport, 537 So.2d 1144 (La.1989); Vicknair v. Hibernia Building Corp., 479 So.2d 904 (La.1985).
In the instant case, the water in the swimming pool was so cloudy by the time of the drowning that it was impossible to see a short distance below the surface much less the bottom of the pool. This created a situation in which a drowning person could not be seen once he had sunk beneath the surface of the water. In addition, there were the added factors of alcohol being served to minors, the absence of a non-party-participant acting as life guard, the large number of swimmers, and the music, dancing, and horseplay in the pool area. The general level of activity and number of people pushing and shoving contributed to the possibility that someone would be injured as well as precluded adequate observation of the pool and the swimmers therein to determine whether anyone was in distress. The expert witness testified that, from a safety standpoint, it is advisable to have clear water and that "[t]here would be no other way" to have such a party than to provide a life guard "constantly in supervision of a pool activity." Under the circumstances, we find that Mrs. Falgout's conduct in allowing these conditions to exist constituted a contributing cause of Shawn's drowning. "Defendant's conduct need not be the sole *502 cause of the harm but it must be a necessary antecedent. Stated another way, if plaintiff can show he probably would not have suffered damages, absent defendant's conduct, he has carried his burden of proving cause in fact." Gibson v. Faubion Truck Lines, Inc., 427 So.2d 68, 71 (La. App. 4th Cir.1983). Accordingly, we find that Mrs. Falgout's conduct was a cause-in-fact of the drowning.
Next we consider the extent of Mrs. Falgout's duty to her guests. "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Prosser and Keeton on the Law of Torts (5th ed.1984). The duty of a property owner was delineated by this court in Walker v. Union Oil Mill, Inc., 369 So.2d 1043, 1047 (La.1979):
In determining an owner's liability under Civil Code Articles 2315 and 2316 the test has been stated to be whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others. The owner and operator of a facility has the duty of exercising reasonable care for the safety of persons on his premises and the duty of not exposing such persons to unreasonable risks of injury or harm. In determining a particular defendant's duty consideration should be given to the nature of the facility and the dangers presented by it. In considering a defendant's duty to a particular person, consideration should be given to the person's age, maturity, experience, familiarity with the premises and its dangers, and other such factors which might increase or decrease the risk of harm to that person. [Citation omitted.]
We find that Mrs. Falgout acted unreasonably by hosting a swimming party with such a large number of people, serving alcoholic beverages to minors, allowing the swimmers to engage in horseplay, allowing the swimming to continue once the water became cloudy, and failing to provide a non-party-participant life guard. By this conduct, and considering the inherent dangers accompanying a swimming pool under the best of circumstances and the young ages of most of the guests, Mrs. Falgout breached her duty to act as a "reasonable" person and to guard against unreasonable risks of injury or harm to her guests.
We find that the particular risk, that one of the guests at the party would drown, was clearly within the scope of the duty. The whole purpose of prohibiting horseplay and minors drinking alcoholic beverages around the pool, of maintaining clear water and providing a life guard is to insure that there are no accidents in the pool, specifically drownings. As the dissenting judge noted, "It is a miracle that only one child drowned or was hurt."
In sum, we find that Mrs. Falgout's conduct was a cause-in-fact of Shawn's drowning, that she had a duty to act as a "reasonable" person in exercising care for the safety of her guests, that she breached that duty, and that the particular risk of the drowning was within the scope of the duty. Therefore, Mrs. Falgout was negligent. The jury was clearly wrong in finding otherwise and the court of appeal erred in affirming that decision.
We turn next to the issue of Shawn's comparative fault, if any. Even though Shawn did not know how to swim, he nevertheless went to the Falgout swimming party where he spent most of his time in the pool. He went down the slide, played in the shallow end, ventured into the deep end and participated in some of the horseplay. In addition, although not legally intoxicated, his blood alcohol level indicated that he had consumed alcoholic beverages that evening. He could have readily seen that the water became cloudy, the pool was crowded, and there was no life guard on duty. He stayed in the water even after the horseplay began and having been thrown into the pool. Clearly, he was old enough to know that he should have left the pool. His conduct was a contributing cause of the drowning. Shawn acted unreasonably under these circumstances. The risk of his drowning was within the scope of his duty to act reasonably. Accordingly, we find he was negligent.
*503 Applying the factors used by the court in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), we find Mrs. Falgout, as the owner of the pool and the adult hostess of the party, to be seventy-five percent at fault and Shawn to be twenty-five percent at fault in the drowning.
Since the court of appeal found no fault on the part of Mrs. Falgout, it did not reach the issue of damages. Accordingly, we consider it more appropriate to remand the case to that court to fix damages.

DECREE
The judgments of the district court and the court of appeal are reversed; the case is remanded to the court of appeal for fixing of damages consistent with the views expressed herein. Costs are to be proportionately borne by the parties.
NOTES
[1] 532 So.2d 776, 780 (La.App. 5th Cir.1988).
[2] 536 So.2d 1227 (La.1989).