796 So.2d 51 (2001)
Claymon Sue WILEY, Plaintiff-Appellant,
v.
Vernon SANDERS, et al., Defendants-Appellees.
No. 34,923-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*53 Catherine J. Smith, New Orleans, Nathan J. Folse, Baton Rouge, Counsel for Appellant.
Hudson, Potts & Bernstein, L.L.P. by Brady D. King, II, Monroe, Counsel for Appellees.
Before BROWN, WILLIAMS and DREW, JJ.
BROWN, J.
This is an appeal from the grant of a motion for summary judgment. Claymon Wiley filed a petition seeking damages for the wrongful death of her nineteen-year-old son, Robert Wiley, who drowned in a pond located on Vernon Sanders' property in Columbia, Louisiana. Ms. Wiley died during the pendency of the litigation, and the administratrix of her succession was substituted as the proper party plaintiff. Defendants, Vernon Sanders and his insurer, filed a motion for summary judgment. The trial court granted the motion and dismissed the petition.

Facts
Robert Wiley drowned just after midnight on June 14, 1992. Mr. Sanders home is on a nine-acre tract in Columbia, Louisiana. At the time of this incident, Mr. Sanders, a millwright, was working in Shreveport, Louisiana. Because he couldn't come home for the weekend, his wife joined him in Shreveport. His eighteen-year-old son, Samuel, remained at home alone and had a group of young people over, many of whom played on the same high school football team. They were drinking alcohol and swimming. Samuel estimated that there were about 20 guests and "there was a lot of people drunk."
On that evening, Robert Wiley had first attended a fish fry where he consumed several beers. From the fish fry, he went to the party at the home of Vernon Sanders. How much he had to drink at the Sanders' home is unclear. Wiley was last seen sitting on a platform or raft floating on the pond with his legs crossed and eyes closed. Participants at the party stated that Richard Morgan first noticed that Wiley was missing. A search of the area found that Wiley's clothes were still on the bank. The sheriff's department was eventually contacted. That morning after daylight, Wiley's body was found in the pond. The autopsy placed the time of death at 12:45 a.m. on June 14, 1992.
The pond which was dug by defendant, Vernon Sanders, was located about sixty yards behind Sanders' house and was used for swimming and fishing. The pond was basically diamond-shaped and covered one-quarter of an acre. It had a gradual slope with no unexpected drop-offs or washouts and the deepest point was seven and one half feet. There were no stumps, concealed or hidden objects in the pond. There was a wooden platform or raft at the pond. At one time the platform had been anchored to the bottom, but had since been turned upside down and pulled onto the shoreline. On this night, the overturned raft had been pushed out into the water. Wiley was last seen sitting on this raft which was estimated to be six to ten *54 feet from the shore. According to Samuel Sanders, a law officer told him that Wiley's body was discovered in knee-deep water approximately 15 feet from the shore. The autopsy performed by Dr. Abdulla Elias revealed no contusions, lesions or head injuries.
Claymon Sue Wiley, the mother of the decedent, filed a petition for damages on June 11, 1993, naming Vernon Sanders and State Farm Fire and Casualty, Sanders' liability insurer, as defendants. Ms. Wiley died on March 27, 1998. On June 18, 1999, Aisha Moore, the administratrix of the succession of Ms. Wiley and sister of the decedent, was substituted as the proper party plaintiff. Trial was set for August 21, 2000; however, defendants file their motion for summary judgment on June 1, 2000.
Attached to the summary judgment motion were depositions of seven of the young men who were at the Sanders residence at one time or another on the night of the drowning, as well as the depositions of Dr. Elias, the pathologist, and Vernon Sanders. Noticeably absent is a deposition or affidavit of Richard Morgan, Wiley's friend. Morgan was with Wiley all evening and first noticed that he was missing.
No one saw Robert Wiley drown, nor did anyone see him swimming prior to his disappearance. Wiley had ridden to the Sanders' house with Richard Morgan and Victor Smith. In his deposition, Smith stated that he watched Wiley undress and walk out to the raft in chest high water. As noted above, Wiley was last seen sitting on the diving platform with his eyes closed and legs crossed.
Dr. Elias, the pathologist who performed the autopsy on Wiley, stated that there were no cuts or contusions on the victim's head or body, nor were there any hematomas or accumulations of blood under the scalp that might indicate a blow to the head. Dr. Elias also related that there was no indication of any trauma to the skull or brain. There was nothing to cause Dr. Elias to suspect foul play. Blood analysis placed Wiley's blood alcohol level at .17 percent.[1]

Discussion
The owner of property may be held liable to a person injured on the property under a theory of negligence if there is a defect on the property which causes the injury and the owner knew or should have known of the existence of the defect. La. C.C. art. 2315; Oster v. Department of Transportation & Development, 582 So.2d 1285 (La.1991). Moreover, at the time of this incident, the owner could also be held liable, under a theory of strict liability, to any person injured because of an unreasonably dangerous condition on the property. La.C.C. art. 2317; Entrevia v. Hood, 427 So.2d 1146 (La.1983); Loescher v. Parr, 324 So.2d 441 (La.1975).[2]
*55 Under strict liability, it is the defendant's legal relationship with the property containing a defect that gives rise to a duty. Oster v. Dept. of Transp. & Development, 582 So.2d 1285, 1288 (La. 1991); Loescher v. Parr, supra. However, the finding of the existence of a defect alone is not sufficient to establish liability. Boyle v. Board of Supervisors, 96-1158 (La.01/14/97), 685 So.2d 1080, 1083. "[A property owner] cannot be held responsible for all injuries resulting from any risk posed by his property, only those caused by an unreasonable risk of harm to others." Entrevia, supra at 1149. Under either negligence or strict liability, the absence of an unreasonably dangerous condition of the property implies the absence of a duty. Oster, supra at 1288; Scantlin v. State Farm Ins. Co., 94-0798 (La.App. 1st Cir.03/03/95), 652 So.2d 640.
Under either theory, negligence or strict liability, the plaintiff must prove that the defendant had custody or garde of the thing which caused the damage, that the thing contained a defect (a condition posing an unreasonable risk of harm to the plaintiff), and that this defective condition caused the plaintiffs injuries. Oster, supra; Bradford v. Louisiana Downs, 606 So.2d 1370 (La.App. 2d Cir.1992). Whether a risk is unreasonable depends on a balancing of all relevant factors, e.g., the utility of the thing that caused the damage, the intended use of the property, and other social considerations. Id.[3]
There is no dispute that the property was in the garde of defendant, Vernon Sanders. Plaintiff has not alleged any defect in the pond itself, such as a submerged hazard or shallow water in a diving area. Further, it is undisputed that there were no posted signs, warnings given or lights around the pond.[4]
According to the deposition testimony of Vernon Sanders, this was not a farm pond having some utility other than as a swimming/fishing hole. Although Mr. Sanders was out of town often because of his work, he readily admitted that his residence was frequently used by his sons and their friends for parties and other gatherings. He stated that his place "has been open to all kids to get them off the roads and out of the streets, that I've never had any objections to young people showing up at my place and having a good time." He was fully aware that alcohol was consumed at these parties and gatherings. He stated that the pond was open to "whoever wants to go fishing, swimming or whatever." Although Mr. Sanders and his wife were out of town for the weekend, he appears to have given tacit approval for his son to have 20 or more young people over, *56 many of whom were drunk, to frolic past midnight in his pond without any supervision.
This action was filed before the recent amendments to the summary judgment law. The amendments, however, are purely procedural and subject to retroactive application. Goodrich v. Caterpillar, Inc., 30,762 (La.App.2d Cir.08/19/98), 717 So.2d 1235. The summary judgment procedure is designed to secure the just, speedy and inexpensive determination of every action, except those disallowed by law; the procedure is favored and must be construed to accomplish these ends. La. C.C.P. art. 966 A(2).
After adequate discovery or after a case is set for trial, a motion for summary judgment should be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. La.C.C.P. art. 966(B). Ebarb v. Guinn Brothers, Inc., 31,426 (La.App.2d Cir.01/20/99), 728 So.2d 487. When a party moving for summary judgment points out to the court an absence of factual support for one or more of the essential elements, an adverse party may not rest on the mere allegations or denials of his pleadings, but must set forth specific facts showing a genuine issue for trial. Talley v. State, 31,367 (La.App.2d Cir.12/09/98), 722 So.2d 390. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. La.C.C.P. art. 967; Norton v. Claiborne Electric Co-op, Inc., 31,886 (La.App.2d Cir.05/05/99), 732 So.2d 1256, writ denied, 99-1823 (La.10/01/99), 748 So.2d 454.
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.07/05/94), 639 So.2d 730.
Whether a thing poses an unreasonable risk of harm is a "disputed issue of mixed fact and law or policy" and is peculiarly suited for the trier of fact, not for summary judgment. Tillman v. Johnson, 92-3277 (La.02/05/93), 612 So.2d 70.
Even if the trial court's conclusion that the pond did not pose an unreasonable risk of harm was correct, a homeowner has a duty to act as a reasonable man and to guard against unreasonable risks of injury to guests.[5]St. Hill v. Tabor, 542 So.2d 499 (La.1989).
*57 The applicable duty here is that of a reasonable man. Duty is defined as the obligation to conform to the standard of conduct associated with a reasonable man in like circumstances. Fox v. State Board of Supervisors of University and Agricultural and Mechanical, 576 So.2d 978 (La.1991). The test to determine whether a breach of a landowner's duty has occurred is whether, in the management of his property, he has acted as a reasonable man in view of the probability of injury to others. Collins v. Whitaker, 29,324 (La.App.2d Cir.04/02/97), 691 So.2d 820; Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La.1976); Ladner v. Firemen's Insurance Co. of Newark, 519 So.2d 1198 (La.App. 2d Cir.1988).
Under the particular circumstances of this case, questions of fact exist concerning whether the pond was unreasonably dangerous and whether defendant, Vernon Sanders, breached a duty owed to guests at the gathering.
Because there remain many issues of fact concerning defendant's duty, breach and causation, summary judgment was not appropriate. We conclude that the trial court erred in granting summary judgment in this case.

Conclusion
Accordingly, the summary judgement in favor of the defendants is reversed. We remand this case for trial on the merits.
REVERSED AND REMANDED.
NOTES
[1] Counsel for plaintiff referred Dr. Elias to the alleged presence of a knot seen on the decedent's forehead at the funeral home. Dr. Elias speculated that such a knot was likely a slippage of the cap of the skull. The top portion of the skull is removed to examine the brain during the autopsy, then replaced. He said that if such a knot were present at the time of the autopsy, there would have been blood under the scalp and it would have been noticed.
[2] Act 1 of 1996, which enacted art. 2317.1 and amended art. 2322, made fundamental changes to the strict liability concept. These changes now require a plaintiff to also prove that defendant knew or should have known of the vice or defect; that the damage could have been prevented by the exercise of reasonable care; and that defendant failed to exercise such reasonable care. The addition of knowledge as an element has effectively eliminated strict liability in most circumstances. See Frank L. Maraist and Thomas C. Galligan, Jr., Louisiana Tort Law § 14-1 (1996). The changes in strict liability made by Act 1 are not procedural, but are considered to have a substantive effect. As such they do not apply retroactively. Jackson v. Beasley, 712 So.2d 162 (La.App. 2 Cir.1998). Thus, we must review Wiley's strict liability claim under the law in effect in 1992 when his cause of action arose.
[3] Defendants state that although they pled the applicability of the Recreational Use Statutes, La.R.S. 9:2791 and 9:2795, these statutes are not the basis upon which they are entitled to judgment.
[4] In Socorro v. City of New Orleans, 579 So.2d 931(La.1991), the unreasonably dangerous injury-causing object was not the lake bottom, but the bulkhead at the dive site, the rip rap forming part of the breakwater, and the lack of signs at that specific area when there were warning signs along other areas of the lake-front. In Thibodeau v. Morgan City, 619 So.2d 595 (La.App. 1st Cir.1993), writ denied, 629 So.2d 362 (La.1993), writ granted in part on other grounds, 629 So.2d 362 (La.1993), there were signs that warned that swimming and diving were "at your own risk," thus misleading the diver into thinking the location was deep enough for diving.
[5] In St. Hill v. Tabor, supra, the Supreme Court found that a homeowner, Mrs. Carolyn Falgout, was negligent and 75% at fault for the drowning death of sixteen-year old Shawn St. Hill, where the homeowner hosted a swimming party on behalf of her son, honoring him for obtaining his GED. The court stated that the homeowner had a duty to exercise care in the safety of her guests. Mrs. Falgout knowingly allowed the guests, who ranged in age from 16 to 20, to drink alcoholic beverages (although the victim had consumed well below the legal limit), swim and participate in horseplay. After a while, the pool water became heavily clouded from guests tracking in the surrounding dirt and grass, and from the horseplay in which guests threw other guests in the pool in their street clothes. Later, while performing a dive in a "diving competition," the guest of honor accidently discovered and pulled Shawn's obscured body from the murky water at the bottom of the deep end of the pool. Although an investigation did not reveal the cause of Shawn's drowning or how he came to be in the deep end of the pool, and no one remembered seeing him immediately before the drowning, the court concluded that Mrs. Falgout breached her duty to act as a "reasonable" person and guard against unreasonable risks of injury to her guests, and this breach was a cause-in-fact of Shawn's death. Id. at 502.

The court concluded that Mrs. Falgout had breached the reasonable man standard in several ways: Mrs. Falgout "acted unreasonably by hosting a swimming party with such a large number of people, serving alcoholic beverages to minors, allowing the swimmers to engage in horseplay, allowing the swimming to continue once the water became cloudy, and failing to provide a non-party-participant life guard."