850 So.2d 771 (2003)
Claymon Sue WILEY, Plaintiff-Appellant,
v.
Vernon SANDERS and State Farm Fire and Casualty Company, Defendants-Appellees.
No. 37,077-CA.
Court of Appeal of Louisiana, Second Circuit.
June 13, 2003.
*773 Catherine Joan Smith, New Orleans, Nathan Joseph Folse, Baron Rouge, for Appellants, Claymon Sue Wiley and Aisha Moore.
Hudson, Potts & Bernstein, LLP by Brady Dean King II, Monroe, for Appellees.
Before STEWART, PEATROSS and DREW, JJ.
DREW, J.
In this drowning case, plaintiff appeals a judgment granting defendants' motion for a directed verdict. We affirm.

FACTS
Vernon Sanders is the owner of a nine-acre tract of land located in Columbia, Louisiana. The property contained a pond that Vernon had constructed for fishing and swimming. On June 13, 1992, he was working on a construction job in Shreveport. His wife joined him there because he was unable to return home for the weekend. Left at home was their 18-year-old son, Samuel. That evening, Samuel Sanders had invited a few people over to his family's home, but more showed up, eventually swelling the gathering to approximately 20 to 30 people. Many of the guests were in the pond. Among them was 19-year-old Robert Wiley. Sometime after midnight, the partygoers were unable to find Robert Wiley when it was noticed that he was missing. That morning after sunrise, Robert Wiley's body was discovered in the pond. He had apparently drowned.
On June 11, 1993, Claymon Wiley, Robert's mother, filed suit against Vernon Sanders and State Farm, his homeowner's liability insurer. Mrs. Wiley died on March 27, 1998. Mrs. Wiley's daughter, Aisha Moore, in her capacity as administratrix of her mother's succession, was substituted as plaintiff in June of 1999.
Defendants filed a motion for summary judgment on June 5, 2000. The trial court rendered judgment granting defendants' motion. That judgment was reversed by this court. See, Wiley v. Sanders, 34,923 (La.App.2d Cir.8/22/01), 796 So.2d 51, writ denied, 01-2661 (La.1/11/02), 807 So.2d 235.
Trial on the merits was held on August 27, 2002. Defendants moved for a directed verdict after the plaintiff concluded her case. The trial court granted the motion. In written reasons for judgment, the trial court stated that the pond was not unreasonably dangerous, and there was no evidence establishing negligence or breach of duty by Vernon. Plaintiff appealed.

*774 DISCUSSION

Plaintiff is attempting to recover under theories of both negligence and strict liability. The owner of property may be held liable to a person injured on the property under a negligence theory (La.C.C. art. 2315) if there is a defect on the property which causes the injury, and the owner knew or should have known of the existence of the defect. Oster v. Department of Transp. & Dev., 582 So.2d 1285 (La.1991); Ebarb v. Guinn Bros., Inc., 31,426 (La.App.2d Cir.1/20/99), 728 So.2d 487. In addition, at the time of the drowning, a property owner could also be held liable under a theory of strict liability (La.C.C. art. 2317) to any person injured because of an unreasonably dangerous condition on the property. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Loescher v. Parr, 324 So.2d 441 (La.1975); Ebarb v. Guinn Bros., Inc., supra. Act 1 of 1996 made fundamental changes to the concept of strict liability with the addition of knowledge as an element; these changes are not applied retroactively. Jackson v. Beasley, 30,359 (La.App.2d Cir.4/8/98), 712 So.2d 162.
Under strict liability, it is the defendant's legal relationship with the property containing a defect that gives rise to a duty. Oster, supra; Loescher, supra. However, the finding of the existence of a defect alone is not sufficient to establish liability. Boyle v. Board of Sup'rs, Louisiana State University, 96-1158 (La.1/14/97), 685 So.2d 1080. "[A property owner] cannot be held responsible for all injuries resulting from any risk posed by his [property], only those caused by an unreasonable risk of harm to others." Entrevia v. Hood, 427 So.2d at 1149. The absence of an unreasonably dangerous condition of the property implies the absence of a duty. Oster, supra.
Under either theory, negligence or strict liability, the plaintiff must prove that the defendant had custody or garde of the thing which caused the damage, that the thing contained a defect (a condition posing an unreasonable risk of harm to the plaintiff), and that this defective condition caused the plaintiff's injuries. Oster, supra; Wiley v. Sanders, supra.
When determining whether a risk is unreasonable, a court is to balance the likelihood and magnitude of the harm and the utility of the thing, while also taking into account a broad range of social, moral, and economic factors including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct when the accident occurred. Oster, supra; Entrevia, supra. Justice and social utility are guideposts, with consideration given to individual and societal rights and obligations. Celestine v. Union Oil Co. of California, 94-1868 (La.4/10/95), 652 So.2d 1299; Jackson v. Beasley, supra.
The pond was constructed by Vernon, who, as a qualified heavy machine operator, had previously assisted in the construction of ponds. He described the pond as being saucer-shaped and having a tapered surface from the pond edges to the center, such that it gradually became deeper toward the middle. He believed that a 6 foot tall individual could walk within 10 feet of the middle and the water would still not be over his head, and if he wanted to continue across the pond, all he had to do was to take two or three "bounce" steps and he would return to a depth where he could walk the remainder of the way. According to Aisha Moore, her brother (the decedent) was 6-feet tall. Samuel estimated that the pond was 8 feet deep in the middle.
There was no fence around the pond, nor were there any markers or signs designating the various depths of the pond.
*775 The only artificial light provided for the pond was from a light in the front yard of the house, and this light only illuminated part of the pond. Vernon estimated that the pond was located approximately 40 to 45 yards from the rear of his home; Samuel believed it was between 60 and 80 yards. Richard Morgan, an acquaintance of Samuel, testified that on the night of the drowning, there was enough natural light for him to see the other people out in the pond.
The water source for the pond was rainfall. Vernon described the pond water as murky, but he thought that a person could see the bottom until the pond water was stirred up from individuals entering the pond. Morgan described the water in the pond as muddy or murky. Morgan also found the bank and pond bottom to be slippery. The pond was cleaned every 12 to 18 months, and the area around the pond was regularly mowed.
Vernon did not feel that there was any need to provide a lifeguard because his children were able to swim. He assumed that everyone who went near the pond would exercise good judgment, and he generally told guests not to get in the pond if they could not swim. Life preservers were hung on the outside of a shed that Vernon testified was located approximately 120 feet from the pond. Samuel estimated that the shed was 80 to 100 yards away from the pond, and he did not think the life preservers were noticeable unless a person went near the shed.
A prominent feature of the pond was a floating dock containing a diving board. The dock was sometimes anchored at the pond's center. According to Vernon, the dock was constructed essentially the same on both its top and bottom, permitting the dock to still be used, even for diving, when it was turned over. Vernon did not believe the dock was unsafe when upside-down.
The diving board would be underwater when the dock was in the upside-down position. On the night of the drowning, the dock was pulled up onto the bank at times, and at other times it was anchored 10 feet from the shore.
Richard Morgan testified that he left work at 10:00 p.m. on the night of the drowning. He then went to the residence of Dale Tucker in order to pick up Robert Wiley, who was attending a gathering at Mr. Tucker's residence. Morgan estimated that he arrived there at 10:30 p.m., and then left with Robert Wiley 10 minutes later. Morgan witnessed Robert Wiley drinking beer there and taking a couple of beer bottles with him when he left. Morgan and Robert Wiley stopped at a gas station before continuing on their journey to Samuel's party. Morgan related that he and Robert Wiley had been at the Samuel's residence the prior evening, and had been told by Samuel to return the next day. Vernon testified that he was unaware of the party, and he added that his children had never previously had a party when either he or his wife was not present.
Morgan testified that upon arriving at the Sanders' property, he and Robert Wiley first went to the home for a few minutes before heading to the pond. Morgan watched Robert Wiley remove his outer clothing and enter the water. He never saw Robert Wiley leave the water. Morgan recalled seeing Robert Wiley playing in the water. When asked what he meant by "playing," Morgan explained:
We was just splashing the water and everybody just, just talking and jumping up, you know, people playing and pushing on each, you know, pushing on each other, you know....
Morgan stated that Robert Wiley was hanging on the side of the dock without any apparent problem the last time he saw him. He did not think Robert Wiley was *776 in any discomfort or was unable to care for himself at the time. Morgan testified that Robert Wiley did not seem anxious or uncomfortable in the water, and he seemed to be enjoying himself. Morgan did not hear any splashes indicating someone was in trouble, and he did not hear anyone cry for help. Morgan stayed in waist-deep water or near the bank while in the pond. He did not want to venture any farther out because he did not know how to swim. Morgan estimated that there were 30 people in the water or on the bank.
Samuel admitted consuming 12 beers that evening, but he denied serving alcohol to those gathered at his family's property. He recalled seeing Robert Wiley three or four times that evening at the house before later seeing him enter the pond in knee-deep water. Samuel believed that it was around midnight the last time he saw Robert Wiley. He recalled that at the time he was leaning on the upside-down dock and Robert Wiley was wading toward the dock in waist-deep water. Samuel was unsure whether the dock was along the pond's bank or 10 feet out when he last saw Robert Wiley. Samuel estimated that around 8 to 10 people were with him at the dock. He also testified that 5 to 10 people were in the pond at that time, and they were grouped in a small area, enabling him to see them.
Samuel stated that after he and the others had been hanging around the dock for approximately 30 minutes, they began leaving the water and heading back to the house. Shortly thereafter, Morgan asked Samuel if he had seen Robert Wiley. Those present began searching for Robert Wiley on land and then in the pond for 10 minutes. After the land was searched again and Robert Wiley had still not been found, the police were summoned. Robert Wiley's body was discovered that morning after daybreak.
Samuel testified that he was told Robert Wiley's body was discovered 15 feet from the bank and 30 feet to the right of the dock. Samuel estimated that this would have been in 4 feet of water. Aisha Moore viewed her brother's body several hours after learning of his death. She testified that his body was covered in mud with mud packed on his face, his hands were clasped like he was grabbing for something, and he had mud under his fingernails. She also saw a knot on his right temple. The death certificate listed drowning as the cause of death. Dr. Alfredo Suarez performed a second autopsy on June 23, 1992. He concluded in his report that the "presence of hemorrhage in the inner ear favor[ed] drowning as the cause of death."
Plaintiff argues that the "totality of the circumstances of the pond" presented an unreasonably dangerous condition. The totality of circumstances is in reference to the muddy or murky nature of the water, and the lack of direct artificial lighting, nearby life-preservers, and signs warning of the pond's depth.
We disagree that the pond in question was unreasonably dangerous to this 19-year-old. There were no obstacles or hazards along the bottom of the pond that would have endangered Robert Wiley or anyone else in the pond. The pond was sloped and did not contain any sudden drop-offs. The only danger presented by the pond was that it contained water. Such a danger would have been open and obvious to Robert Wiley when he entered the pond. The evidence established that Robert Wiley spent his initial moments in the pond without difficulty. Without question, Robert Wiley was in the best position to avoid this accident by not entering the water in the first place if he was unable to swim.
*777 Because the pond did not present an unreasonably dangerous condition, the issue is then framed as whether Vernon breached a duty to act as a reasonable man. A homeowner has a duty to act as a reasonable man and to guard against unreasonable risks of injury to guests. St. Hill v. Tabor, 542 So.2d 499 (La.1989); Wiley v. Sanders, supra. The test to determine whether a breach of a landowner's duty has occurred is whether, in the management of his property, he has acted as a reasonable man in view of the probability of injury to others. Shelton v. Aetna Casualty and Surety Co., 334 So.2d 406 (La. 1976); Wiley v. Sanders, supra.
In St. Hill v. Tabor, supra, the adult hostess of a party was found to be 75% at fault for the drowning death of a 16-year-old who attended a party for the hostess's son at her home. Although the victim had been unable to swim, he had voluntarily entered the swimming pool and participated in horseplay. The supreme court found that the homeowner had acted unreasonably by hosting a swimming party with 150 guests, serving alcoholic beverages to minors, allowing the swimmers to engage in horseplay, allowing the swimmers to continue even after the water had become cloudy, and failing to provide a lifeguard who was not participating in the party.
The evidence in this matter failed to establish that Vernon breached any duty owed to Robert Wiley. Unlike the parent in St. Hill v. Tabor, supra, Vernon was not even present on the date of the drowning, as he was out-of-town at the time, with no knowledge of the party, apparently organized by his 18-year-old son, Samuel, at his home. Moreover, 19-year-old Robert Wiley, had he exercised reasonable care, should have observed that he could drown in a pond filled with water. "[A] landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care." Shelton v. Aetna, 334 So.2d at 410.
A motion for a directed verdict is appropriately made at the close of the evidence offered by the opposing party. The motion should be granted when, after considering all the evidence in the light most favorable to the opposing party, the facts and inferences so overwhelmingly favor a verdict for the moving party that the trial court believes reasonable jurors could not have arrived at a contrary conclusion. Jurls v. Ford Motor Co., 32,125 (La.App.2d Cir.1/6/00), 752 So.2d 260. If there is substantial evidence opposed to the motion, i.e., evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the case submitted to the jury. Brockman v. Salt Lake Farm Partnership, 33,938 (La.App.2d Cir. 10/4/00), 768 So.2d 836, writ denied, 00-3012 (La.12/15/00), 777 So.2d 1234. The decision of whether to grant a motion for a directed verdict is left to the discretion of the trial judge. Collins v. Whitaker, 29,324 (La.App.2d Cir.4/2/97), 691 So.2d 820.
The standard of review of a trial judge's grant of a directed verdict is whether, viewing the evidence submitted, reasonable men could not reach a contrary verdict. In addition, the appellate court must evaluate the propriety of a directed verdict in light of the substantive law related to the claims. Steed v. St. Paul's United Methodist Church, 31,521 (La. App.2d Cir.2/24/99), 728 So.2d 931, writ denied, 99-0877 (La.5/7/99), 740 So.2d 1290.
After reviewing this record in a light most favorable to plaintiff, we agree with the trial court that the facts and inferences *778 so overwhelmingly favored a verdict for defendants that reasonable jurors could not have arrived at a contrary conclusion. Accordingly, the trial court did not err in granting the motion for a directed verdict.

DECREE
At appellant's costs, the judgment is AFFIRMED.